645 P.2d 784

**STATE of Arizona, Appellee,**

v.

**Michael Kent POLAND, and Patrick Gene Poland, Appellants.**

**Nos. 4969, 4970.**

Supreme Court of Arizona, In Banc.

April 13, 1982.

Rehearing Denied May 25, 1982.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Gerald R. Grant, Asst. Attys. Gen., Phoenix, for appellee.

Boyle, Brown, Eaton & Pecharich by Wm. Lee Eaton, Prescott, for appellant Michael Kent Poland.

John C. Stallings, Prescott, for appellant Patrick Gene Poland.

CAMERON, Justice.

This is a consolidated appeal by defendants Michael Kent Poland and Patrick Gene Poland from jury verdicts of guilt to the crimes of first degree murder of Cecil Newkirk and Russell Dempsey, in violation of former A.R.S. §§ 13–451 and 13–452. Defendants were sentenced to death pursuant to former A.R.S. §§ 13–453(A) and 13–454(E). We have jurisdiction of this appeal pursuant to A.R.S. § 13–4031.

Because we must reverse as a result of jury misconduct, we need not consider all the questions raised by the defendants. We will, however, consider those questions which are likely to be raised again on retrial of the matter, it being kept in mind that different evidence presented at retrial might mandate different results.

Defendants raise the following issues on appeal:

1. Jurisdiction:

(a) Did the State of Arizona lack jurisdiction and the County of Yavapai lack venue to try defendants because of failure to show that the crimes were committed in the State of Arizona and the County of Yavapai?

(b) Did the prior federal prosecution of defendants arising out of the same facts bar the action in the state court?

2. Suppression of Evidence:

(a) Did a tour of Michael Poland's house constitute an impermissible warrantless search?

(b) Was the search warrant based on statements made in reckless disregard for the truth?

(c) Was the search warrant based on tainted, post-hypnotic statements of a witness?

(d) Was the scanner, scanner key, and taser gun receipt seized during the search outside the scope of the search warrant?

(e) Did the trial court err in allowing the taser gun to be admitted into evidence?

(f) Was it reversible error to admit the testimony of a witness who, prior to trial, had been hypnotized and questioned on the subject of his testimony?

3. Was the evidence sufficient to support the verdict?

4. Did the jury's knowledge of extraneous information deny the defendants a fair trial?

5. Was there sufficient evidence to find that the murders were committed in an especially heinous, cruel or depraved manner?

The facts necessary to a determination of this appeal are as follows. At approximately 8 A.M. on 24 May 1977, a Purolator van containing some $328,180 in cash left Phoenix on a routine delivery to banks in various towns in northern Arizona. When the van failed to make its deliveries, the authorities were notified. The abandoned van with some $35,150 in cash was discovered early the next day a short distance off Highway I–17.

The evidence revealed that on the morning of 24 May 1977, a number of passing motorists had noticed a Purolator van pulled over to the side of Highway I–17 by what appeared to be a police car. Some witnesses identified the two uniformed men as Michael and Patrick Poland. The evi-

dence also showed that on 24 May 1977, Michael and Patrick Poland borrowed a pickup truck and tarpaulin from their father, George Poland. Early on 25 May 1977, Michael Poland rented a boat at the Temple Bar Marina on Lake Mead. He stated that he planned to meet his brother Patrick at Bonelli Landing, a primitive camping area on the Lake, and to do some fishing. At some point, George Poland's truck became stuck in the sand at the water's edge at Bonelli Landing with the tailgate facing the water. After their attempts to extricate it had failed, the Polands called a towing service. Stan Sekulski was the operator of the tow truck. A few days later, the Polands returned their father's truck with a new tarp, explaining the old one had been ruined when they placed it under the wheels of the truck for traction.

Three weeks later, the body of Cecil Newkirk, one of the guards of the Purolator van, surfaced on Debbie's Cove, a small inlet on the Nevada side of Lake Mead. The body was partially covered by a canvas bag. A week later, park rangers searching the area discovered the body of the other Purolator guard, Russell Dempsey, a short distance from the place Cecil Newkirk's body had been found. Autopsies revealed that the most probable cause of death was drowning, although in the case of Mr. Dempsey the pathologist was unable to rule out a heart attack as a possible cause of death. The bodies had been in the water two weeks or longer. There was no evidence that the guards had been wounded or tied before being placed in the water. Although it was impossible to determine whether they had been drugged, there was no evidence of a struggle. Divers searching the area recovered two other canvas bags, one containing a tarp and blanket. They also brought up two revolvers, which were identified as belonging to the guards, and a license plate bearing the insignia found on Arizona Department of Public Safety automobiles. These were found near a pile of rocks which had evidently fallen out of the bag when it was recovered by a diver. The rocks were of the type found along the shore of Debbie's Cove.

Searches of the homes of Michael and Patrick Poland on 27 July 1977 revealed a number of weapons, including a taser gun, large amounts of cash, and items of police-type paraphernalia. Of particular interest were a scanner and scanner key which were capable of monitoring radio frequencies, a notebook listing local police frequencies, a receipt for a taser gun bearing the name Mark Harris, handcuff cases, and a gunbelt. Both of the rented cars of the Polands, which were light-colored Chevrolet Malibus, had siren-type burglar alarms which could be activated from inside or outside of the car. Evidence also connected the Polands to the purchase of a "light bar" or rack which could be placed on top of an automobile and would resemble a law enforcement light bar or rack. The canvas bags found in the lake were shown to have been purchased by a Mark Harris.

Although neither Michael nor Patrick Poland had regular employment, the evidence showed that they made numerous large purchases during June and July of 1977. These purchases included appliances, furniture, motorcycles, and a business. Most of the purchases were made in cash or by a cashier's check.

The Polands' defense was alibi. They both took the stand and testified that they had disguised themselves as law enforcement officers and robbed drug dealers on three occasions in early 1977. They testified that they had also been dealing in gems for several months prior to the Purolator incident and that on 24 May 1977, had taken a load of raw turquoise to Las Vegas and returned by way of Lake Mead to do some camping.

From the jury verdicts and judgments of guilt to first degree murder of Cecil Newkirk and Russell Dempsey, sentences of death, and denial of their motion for a new trial, defendants appeal.

## JURISDICTION

a. Did the murder occur outside the jurisdiction of Arizona?

The evidence supports a finding that defendants stopped the Purolator van some-

where near the Bumble Bee exit off Highway I–17 in Yavapai County, Arizona, where they captured the two guards and took the contents of the van. The following day, defendant Michael Poland rented a boat at the Temple Bar Marina, located on Lake Mead in Mohave County, Arizona. He met his brother Patrick in the boat at Bonelli Landing, also in Mohave County. The evidence would support a finding that the defendants loaded the two guards into the boat, traveled some distance, and dumped them into the water. The bodies of the two guards were found a few miles from Bonelli Landing, in Debbie's Cove, in Clark County, Nevada. The evidence does not indicate where the deaths of the two victims actually took place.

The defense argues that, because the State had been unable to prove where the guards died, the State of Arizona has no jurisdiction to try the Polands for murder. We do not agree. Even if we assume that the actual murder took place on the Nevada side of Lake Mead, there are sufficient elements of the crime which occurred in Arizona to give the Arizona court jurisdiction.

 Generally, a homicide is "committed" where the fatal wound or blow is inflicted. 40 Am.Jur.2d Homicide § 198. Jurisdiction, however, is not limited to those crimes committed totally or exclusively within the state. Jurisdiction of the Arizona courts in criminal cases extends to crimes when any element has been committed in the State of Arizona.

"A. This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which such person is legally accountable if:

1. Conduct constituting any element of the offense or a result of such conduct occurs within this state; * * * " A.R.S. § 13–108(A)(1).

When the elements of a crime are committed in different jurisdictions, any state in which an essential part of the crime is committed may take jurisdiction. *State v. Scofield*, 7 Ariz.App. 307, 438 P.2d 776 (1968). "Any element," then, can confer jurisdiction. *State v. Bussdieker*, 127 Ariz. 339, 621 P.2d 26 (1980).

 The elements of first degree murder are: (1) the unlawful killing (2) of a human being (3) with malice aforethought. Former A.R.S. § 13–451(A). There was evidence of the defendants' activities in planning the crime, for example, the purchase of the canvas bags used to hold the bodies of the victims and the boat rental. These acts constituted evidence of premeditation from which the element of malice aforethought could be inferred. *State v. Tostado*, 111 Ariz. 98, 523 P.2d 795 (1974); *State v. Bustamante*, 103 Ariz. 551, 447 P.2d 243 (1968). These acts of premeditation occurred in Arizona. We hold that Arizona had jurisdiction to try the defendants.

But defendants also urge that they should not have been tried in Yavapai County because of improper venue. Defendants contend that they have a state constitutional right to be tried in the county where the deaths occurred. The Arizona Constitution states:

"Section 24. In criminal prosecutions, the accused shall have the right * * * to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed, * * *." Arizona Constitution, Art. 2, § 24.

And our statute at the time of the offenses read:

"Where several acts are requisite to the commission of an offense, the trial may be in any county in which any of such acts occurs." Former A.R.S. § 13–1504(B). See present A.R.S. § 13–109(A).

In dismissing a Pima County indictment for attempted murder for hire, where the payment for the murder was made in Pinal County, our Court of Appeals stated:

"We therefore hold that under A.R.S. Sec. 13–1504(B) the act must be one essential to the commission of the crime charged as such crime is defined by statute. In other words, the act must be part of the corpus delicti of the crime if it is to have any jurisdictional significance. (citations omitted)" *State v. Cox*, 25 Ariz. App. 328, 331, 543 P.2d 449, 452 (1975).

We believe the instant case and *State v. Cox*, supra, can be distinguished. In *Cox*, all the acts constituting the crime of attempted murder for hire occurred in Pinal County and Pima County was not the correct venue. In the instant case, the crime is premeditated murder. Premeditation is part of the corpus delicti of the crime of first degree murder and the evidence indicates that, in addition to an intent, there were numerous acts of premeditation which occurred in Yavapai County, including particularly the kidnapping of the victims. There were, then, sufficient essential acts requisite to the commission of the crime which occurred in Yavapai County. Venue for the trial was properly in Yavapai County.

b. Does the principle of double jeopardy bar prosecution by the State of Arizona?

Prior to the trial in the instant case, the defendants were convicted in federal court of armed robbery and kidnapping of the two guards. The trial in Arizona was for the murder of the same two guards. Defendants urge that prosecution by the State of Arizona was barred by their conviction in federal court for acts arising out of the same transaction. We do not agree.

In *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), the Supreme Court of the United States held that state prosecutions of defendants who had already been prosecuted in federal court for the same acts did not violate due process. The court in *Bartkus* reasoned that an individual is a citizen of both the United States and a state or territory and is subject to the laws of both. Because a single act could violate both federal and state law, prosecutions by the state and the federal government may be based on a single act and be proven by the same facts without violating due process. The court in *Bartkus* said:

"With this body of precedent as irrefutable evidence that state and federal courts have for years refused to bar a second trial even though there had been a prior trial by another government for a similar offense, it would be [in] disregard of a long, unbroken, unquestioned course of impressive adjudication for the Court now to rule that due process compels such a bar. * * *" *Bartkus v. Illinois*, supra, 359 U.S. at 136, 79 S.Ct. at 685, 3 L.Ed.2d at 694.

*Bartkus* stands for the rule that, as far as the United States Constitution reaches, a defendant may, based upon the same facts, be guilty of crimes against two sovereigns at the same time and be punished for each crime separately and without regard to the other.

Although some state courts have suggested limits to *Bartkus*, *Commonwealth v. Mills*, 447 Pa. 163, 286 A.2d 638 (1971); *State v. Fletcher*, 26 Ohio St.2d 221, 271 N.E.2d 567 (1971); *People v. Cooper*, 398 Mich. 450, 247 N.W.2d 866 (1976), we find no reason to change this long standing rule. We hold that, even if the defendants were charged and convicted upon the same set of facts that supported the federal convictions, the United States Constitution and *Bartkus* would allow the state convictions to stand.

Defendants contend, however, that the Arizona prosecution is barred by former A.R.S. § 13–146 (now A.R.S. § 13–112), which stated:

"When on the trial of an accused person it appears that upon a criminal prosecution under the laws of the United States, or of another state or country, founded upon the act or omission in respect to which he is on trial he has been acquitted or convicted, it is a sufficient defense." A.R.S. § 13–146 (now A.R.S. § 13–112).

We disagree. This is not a situation of parallel prosecutions. The prosecutions were for distinct and separate crimes occurring at different times. The federal prosecutions were for kidnapping and armed robbery, while the state prosecution was for murder. A.R.S. § 13–146 does not prevent Arizona from prosecuting the Polands for murder. See *Henderson v. State*, 30 Ariz. 113, 244 P. 1020 (1926); *State v. Wortham*, 63 Ariz. 148, 160 P.2d 352 (1945).

■ Defendants also urge that the state prosecution constitutes double punishment contrary to A.R.S. § 13–116. They urge that the same evidence used by the federal prosecution was "reused" to convict them of separate crimes in the state court. Under the identical elements test, evidence supporting one charge is eliminated to determine whether the remaining evidence supports the elements of the additional charge. *State v. Tinghitella*, 108 Ariz. 1, 491 P.2d 834 (1971). In the instant case, as we have noted above, all three crimes have sufficient separate factual bases to stand alone. Further, the identical elements test applies only when the State seeks convictions for more than one crime arising out of the same criminal transaction. Here the State only charged the defendants with murder, and the double punishment section does not apply. We find no error.

### SUPPRESSION OF PHYSICAL EVIDENCE

a. Tour of Michael Poland's house.

During the investigation of the crimes, the F.B.I. learned that the home Michael Poland was renting was for sale. Agent Gotliebson, who had been conducting a surveillance on Michael Poland's residence, contacted the realtor and, posing as a prospective home buyer, arranged to view the premises. During the tour on 24 June 1977, which included the house, garage, barn, and various shelves and closets in the house, Agent Gotliebson noted a number of firearms and two motorcycles. A search of Michael Poland's house pursuant to a warrant was executed on 27 July 1977.

Because Gotliebson gained entry by misrepresenting his identity and purpose, the defendants urge that the entry was an illegal search in violation of the Fourth and Fourteenth Amendments, and all evidence seized pursuant to the subsequent search warrant must be suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ We do not agree. The government is entitled to use decoys and to conceal the identity of its agents, *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), and law enforcement officers may pose as potential buyers to investigate illegal firearms, *United States v. Ressler*, 536 F.2d 208 (7th Cir. 1976); or narcotics, *United States v. Glassel*, 488 F.2d 143 (9th Cir. 1973). They may also state that they are on some other business to gain access to property or induce the suspect to open the door. For example, law enforcement officials posed as a hotel manager in *State v. Sardo*, 112 Ariz. 509, 543 P.2d 1138 (1975); a friend in *United States v. Raines*, 536 F.2d 796 (8th Cir. 1976); a motorist with car trouble in *United States v. Wright*, 641 F.2d 602 (8th Cir. 1981); and a potential Ku Klux Klan member in *United States v. Bullock*, 590 F.2d 117 (5th Cir. 1979).

■ The only limitation appears to be that the agent is limited to conduct which would be normal for one adopting the disguise used in seeking entry:

"When an agent assumes a particular pose in order to gain entry into certain premises and then obtains information by engaging in *activity not generally expected of one assuming that pose*, that information is illegally obtained * * *." *United States v. Ressler*, supra, at 211. (emphasis added)

■ In the instant case, the agent saw what would normally be seen by any prospective buyer inspecting the house. The defendant, however, urges that the reasonableness of the search accomplished through deception depends upon whether the agents were present for purposes contemplated by the occupant. We do not agree. The court in *Lewis*, supra, did consider it relevant that the official was on the premises "for the very purposes contemplated by the occupant." However, defendant's reliance on the *purpose* as the distinguishing factor between permissible and impermissible searches is, we believe, misplaced. In the case of a deceitful entry, the law enforcement agent's purpose will, by

definition, be different than that contemplated by the suspect. In the instant case, the agent may see only what any prospective buyer would expect to see. To hold that the validity of the search in the case of deceitful entry depends upon whether the purpose of the agent in entering the premises was the same as the reason the suspect allowed him to enter, would make all deceitful entry searches unconstitutional. The distinction, then, between permissible and impermissible intrusions turns on what the suspect, as a result of the agent's deceit, has chosen to show to the one entering the premises. The United States Supreme Court has stated:

> " * * * the Fourth Amendment protects people not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967).

We hold that the entry did not constitute an unreasonable search.

### b. Sufficiency of the search warrant affidavit

During the preliminary investigation of the crimes, the Poland brothers emerged as suspects. The F.B.I. formulated the theory that the Polands, disguised as law enforcement officials and driving what appeared to be a police vehicle, had pulled over the Purolator van on Highway I–17 and stolen the cash it was carrying. The F.B.I. suspected that the Polands overpowered the guards and took them to Lake Mead, where they dumped them into the water. To substantiate this theory, the F.B.I. sought search warrants for the homes, cars, rented storage lockers, and persons of Michael and Patrick Poland, and the home and truck of their father, George Poland. The affidavit for a search warrant requested authorization to seize, among other things, currency, money bags, police-type wearing apparel and paraphernalia, weapons, cloth bags large enough to place over an individual, and receipts of expenditures. The affidavit executed by F.B.I. Special Agent John Oit-

zinger runs more than four typed pages, detailing the facts of the crimes and findings of the investigation. The affidavit included the report of a tracker regarding wheel tracks on the shoulder of I–17 where the F.B.I. believed the van was stopped and statements of witnesses who saw a "police car" and the van pulled off the road. It also included statements of the individual who rented a boat to Michael Poland. The affidavit noted that collect calls were made from the Bumble Bee area to Patrick Poland's home on two occasions prior to the crimes. It alleged that neither Michael or Patrick Poland had worked at regular employment recently, but that both had made substantial purchases in the two months following the crimes. We believe that the recital of facts in the affidavit was sufficient to support the issuance of the warrant.

Defendants contend, however, that some of the statements in the affidavit were made in reckless disregard of the truth. Two weeks after the crime, the boat that was rented by Michael Poland on 25 May 1977 was identified and impounded by the F.B.I. A routine report was prepared by Special Agent Oldham, in which he stated that there was a "small red stain" on the bottom of the scoop which had been found in the boat. In preparing his affidavit for the search warrant, Agent Oitzinger reviewed the reports, examined the scoop, and wrote the following description:

> "Some hairs and fibers and blood found on a plastic half gallon container with the bottom cut off (probably used for the purpose of bailing water) and an empty Coors beer can were retained as evidence."

Several days after the affidavit was signed, Agent Oitzinger received the results of the tests conducted by the F.B.I. Laboratory in Washington, D.C., which indicated that the scoop contained no hair, fibers, or blood.

Defendants, citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), urge that the statement that the scoop contained blood was a knowing or intentional falsehood, or, alternatively, that

it was made with a reckless disregard for its truth or falsity. They contend that evidence of blood is so prejudicial in a murder investigation that it contributed substantially to a finding of probable cause. They conclude that the search warrant based on false information was invalid and that all evidence seized pursuant to it must be suppressed.

In *Franks v. Delaware*, supra, the United States Supreme Court held that a defendant may attack a search warrant affidavit when probable cause was based on intentional or reckless falsehood. If the defendant is able to make a substantial preliminary showing that the false statement was made knowingly and intentionally, or with reckless disregard for the truth and that the false statement is necessary to a finding of probable cause, the defendant is entitled to a hearing. If at the hearing defendant proves perjury or reckless disregard by a preponderance of the evidence, the false statement is excised from the affidavit. The affidavit's remaining content must be sufficient to establish probable cause, or the search warrant is voided and evidence seized pursuant to it excluded. *United States v. Young Buffalo*, 591 F.2d 506 (9th Cir. 1979).

In the instant case, Oitzinger admitted that the portion of the affidavit alleging that there was blood on the scoop was false but not intentionally or recklessly false. He testified concerning the preparation of the affidavit:

"Q And that was not true with respect to the blood sample that was included in the affidavit, the reference to the blood sample, was it?

"A At the time I reported that I wasn't sure. I thought it was blood.

\* \* \* \* \* \*

"BY MR. EATON: It wasn't the truth, was it?

"A At the time I thought it was.

"Q It was not the truth, was it? Answer the question yes or no.

"A At the time I thought it was the truth.

"Q All right. You had no expert information which you bothered to consult which would have told you whether or not that statement that you were making in the affidavit was the truth, isn't that correct?

"A It turns out it was not the truth.

"Q And you didn't think that was reckless conduct on your part?

"A No, I do not."

We do not believe that Agent Oitzinger's failure to obtain the test results before signing the affidavit constituted reckless disregard for the truth. In *United States v. Davis*, 617 F.2d 677 (D.C.Cir.1979), the court defined reckless disregard for the truth by analogy to the law of defamation. Citing *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) and *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the *Davis* court found that the affiant acted with reckless disregard if he "in fact entertained serious doubts as to the truth of his publication." This could be shown by actual deliberation or by "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Davis*, supra at 694. Agent Oitzinger's testimony indicates that he did not entertain serious doubts as to the truth of his affidavits and we agree. However, even if we believed that the actions of the agent constituted a reckless disregard for the truth, the affidavit's remaining contents are sufficient to establish probable cause. *United States v. Young Buffalo*, supra. We find no error.

c. Was the search warrant based on improper post-hypnotic statements?

Defendants next challenge the use of post-hypnotic statements made by Stan Sekulski, a witness for the prosecution, who towed George Poland's truck out of the sand at Bonelli Landing on 25 May 1977. Defendants cite *State v. La Mountain*, 125 Ariz. 547, 611 P.2d 551 (1980) and *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981) for the proposition that statements by a witness who has been hypnotized are unreliable and inadmissible in criminal cases. We

have not precluded, however, the use of hypnosis for the purpose of finding probable cause for the issuance of a search warrant. As we noted:

" * * * Although we perceive that hypnosis is a useful tool in the investigative stage, we do not feel the state of the science (or art) has been shown to be such as to admit testimony which may have been developed as a result of hypnosis. * * * " *State v. La Mountain,* supra, 125 Ariz. at 551, 611 P.2d at 555.

And again:

"In conclusion, the use of hypnosis during the investigative stage is permissible if used with great reserve by trained personnel with reasonable safeguards." *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 187, 644 P.2d 1266, 1273 (filed 7 January 1982). On 2 March 1982, the Motion for Rehearing was granted in *State ex rel Collins v. Superior Court* to reconsider the hypnotism issue.

 Whatever the rule may be regarding hypnotically induced testimony at trial, we have not excluded hypnotically produced statements to determine probable cause for a search warrant. Such statements, like hearsay, if properly corroborated, are not unreliable and may be used to find probable cause for the issuance of a search warrant. We find no error.

d. Seizure of the taser gun, scanner, and scanner key.

During the search of Mike Poland's home, on 26 July 1977, F.B.I. agents found a receipt from a gunshop for a taser gun, a weapon which temporarily paralyzes the victim with an electrical charge. The name on the receipt was Mark Harris. They also discovered a scanner, which is an instrument used to monitor radio frequencies. At Patrick Poland's house, they found a scanner key. These items were retained as evidence and later introduced at trial. Defendants contend that these items were neither contraband nor listed in the search warrant and therefore were illegally seized. Because the link of the items to the crime was speculative, defendants argue that the items were unduly prejudicial and should have been suppressed at trial.

 Arizona law provided that evidence may be seized even though it is not listed in the search warrant. Former A.R.S. § 13–1446(C) stated:

"A peace officer executing a search warrant may seize any property discovered in the course of the execution of such warrant if he has reasonable cause to believe that such item is subject to seizure under § 13–1442, even if such property is not enumerated in the warrant."

The F.B.I. investigation had revealed that the robbery of the Purolator van had been committed by people posing as law enforcement officials. Evidence of the defendants' capability to monitor police radio frequencies was therefore relevant. The taser gun receipt also indicated that it had been purchased by an alias or accomplice, suggesting that it may have been purchased in contemplation of the crime or by another involved in the crime. We hold that the receipt for the taser gun, scanner, and scanner key were seizable under former A.R.S. § 13–1446(C).

 Defendants, however, challenge the seizure on United States constitutional grounds, urging that seizure of items unnamed in the warrant constituted a general search which is proscribed by the Fourth and Fourteenth Amendments. We do not agree. Evidence may be seized if it is reasonably related to the crime, even if not listed in the search warrant. See *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). We have stated:

"The record clearly supports the conclusion that the officers were on Scigliano's premises pursuant to execution of a valid search warrant and that the challenged items * * * were found during a limited search which was reasonably calculated to locate items actually named in the warrant, as opposed to a general exploratory search of the premises. We also believe that the facts surrounding the search * * * provided a sufficient nexus

between the disputed items and the crime for which the warrant was issued, so that the officers had probable cause to believe that those items were 'reasonably related' to the crime." *State v. Scigliano*, 120 Ariz. 6, 9, 583 P.2d 893, 896 (1978). See also *State v. Smith*, 122 Ariz. 58, 593 P.2d 281 (1979); *State v. Shinault*, 120 Ariz. 213, 584 P.2d 1204 (App.1978).

We hold that the receipt for the taser gun, the scanner, and the scanner key were properly seized and admitted at trial.

e. Admissibility of the taser gun.

Defendants challenge the admissibility of the taser gun, arguing that its connection to the crimes was never proven and therefore that its probabtive value was greatly outweighed by its prejudicial effect.

 The initial question is whether the gun was relevant to issues in the case. Rule 401, Arizona Rules of Evidence, 17A A.R.S. states:

> " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

We do not believe that the taser gun was relevant to a determination of the facts in this case. Admission into evidence of weapons which are not connected with the crime can be prejudicial to the defendant and has been held to be reversible error. *United States v. Green*, 648 F.2d 587 (9th Cir. 1981); *United States v. Warledo*, 557 F.2d 721 (10th Cir. 1977). In the instant case, the State did not connect the weapon to the crime, and it was an abuse of discretion to admit the taser gun into evidence.

f. Admissibility of post-hypnotic statements at trial.

Defendants also argue that Mr. Sekulski's post-hypnotic testimony should have been excluded at trial, citing *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981) and *State v. La Mountain*, 125 Ariz. 547, 611 P.2d 551 (1980). *Mena* and *La Mountain* were both decided by this court after the trial in the instant case. Upon retrial, we assume that the trial court will comply with the decisions of this court concerning the admissibility of hypnotically induced testimony. See *State ex rel. Collins v. Superior Court*, supra.

## SUFFICIENCY OF THE EVIDENCE

 Pointing to a number of gaps in the State's case, the defendants argue that there was insufficient evidence to support the verdict. If there was insufficient evidence to support a conviction, it would not be proper to remand for a new trial as the double jeopardy clause of the Fifth Amendment precludes a second trial after appeal where there was insufficient evidence to sustain the verdict. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

 We find that there was substantial evidence to support the jury's verdict. Defendants were linked to purchases of weapons, canvas bags, and police-type paraphernalia. Their own testimony placed them on the highway on the day of the robbery and at Lake Mead renting a boat on the following day. Though unemployed, both began paying off bills and making large cash purchases shortly after the robbery. Where there exists "substantial evidence from the entire record from which a rational trier of fact could have found guilt beyond a reasonable doubt," we will uphold the verdict. *State v. Schad*, 129 Ariz. 557, 572, 633 P.2d 366, 381 (1981). The jury chose to believe the evidence offered by the State and to disbelieve the alibis of the defendants. This was their prerogative. *State v. Pieck*, 111 Ariz. 318, 529 P.2d 217 (1974). There was sufficient evidence upon which the trier of fact could find the defendants guilty. The defendants may be retried. *Burks*, supra. We find no error.

## JURY MISCONDUCT

Rule 24.1(c), Arizona Rules of Criminal Procedure, 17 A.R.S., provides, in part, that the court may grant a new trial when:

> "(3) A juror or jurors have been guilty of misconduct by:

(i) Receiving evidence not properly admitted during the trial;

\* \* \* \* \* \*

(iii) Perjuring himself or willfully failing to respond fully to a direct question posed during the voir dire examination;"

And subsection (d) provides:

"d. Admissibility of Juror Evidence to Impeach the Verdict

"Whenever the validity of a verdict is challenged under Rule 24.1(c)(3), the court may receive the testimony or affidavit of any witness, including members of the jury, which relates to the conduct of a juror, official of the court, or third person. No testimony or affidavit shall be received which inquires into the subjective motives or mental processes which led a juror to assent or dissent from the verdict." Rule 24.1(c & d), Arizona Rules of Criminal Procedure, 17 A.R.S.

■ Inquiry into jury misconduct was limited at common law by the rule that a juror who has agreed to the verdict in open court may not later impeach his own verdict. *State v. Cookus*, 115 Ariz. 99, 563 P.2d 898 (1977). The policy was to protect the process of frank and conscientious jury deliberations and the finality of jury verdicts. See Carlson and Sumberg, Attacking Jury Verdicts: Paradigms for Rule Revision, 1977 Ariz. State L.J. 247. However, when *jury misconduct results in prejudicial influences on the jury*, the defendant might be deprived of procedural safeguards afforded by a trial, the right to counsel, to confront witnesses against him, and to choose not to take the stand on his own behalf. *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *State v. Skinner*, 108 Ariz. 553, 503 P.2d 381 (1972). Therefore, our rules now provide that juror testimony is admissible to impeach a verdict, but only for the types of jury misconduct enumerated in Rule 24.-1(c)(3), Arizona Rules of Criminal Procedure, 17 A.R.S., and in the manner provided by subsection (d), supra. See Comment to Rule 24.1; *State v. Rose*, 121 Ariz. 131, 589 P.2d 5 (1978). See also American Bar Association Standards Relating to Trial by Jury, § 5.7 (Approved Draft, 1968); *State v. Landrum*, 25 Ariz.App. 446, 544 P.2d 270 (1975). In the instant case, affidavits and testimony by the jurors were admissible to show specific instances of jury misconduct.

a. Considering evidence not admitted at the trial.

Prior to trial and again before deliberations, the jury had been admonished and instructed "you must determine the facts only from the evidence produced in court." During deliberations, one juror looked up Harris names in the Phoenix telephone directory. Juror Phyllis Clemmer testified:

"Q Mrs. Clemmer, tell us if you will in your own words as best you can about the phone book matter relating to, number one, the name Mark Harris, and, number two, Phoenix Tent and Awning?

"A Gail Peoples said during the deliberations, well, I wonder how many Mark Harrises there are in Phoenix, and I said, well, I have a Phoenix phone book at home, I will look it up for you. So I looked it up that night and in the morning I said that there are four Mark Harrises listed in the Phoenix phone book. This was a 1979 phone book. And Gail was so speculative about whether or not the bags had been made at Phoenix Tent and Awning, and I said, well, I lived there for an awful lot of years and I don't know of another tent and awning manufacturer in Phoenix, so they must have been made there.

So while I was looking in the phone book I looked under tent and awning and found several retail places—several places that rented tarps and canvas products, but only one manufacturer which was a fact that I was already sure of in my mind; that is all I did.

"Q And did you relate something back to the jury at all one way or the other about the Phoenix Tent and Awning?

"A Just that was the only manufacturer listed."

Mark Harris was the name found on the taser gun and canvas bags receipts. Phoe-

nix Tent and Awning, the business which allegedly made the canvas bags found with the victims, was the only manufacturer of canvas bags in the Phoenix area. She reported her findings to the jury. Defendants contend that this evidence was not properly before the jury, was prejudicial, and mandated a new trial under Rule 24.-1(c)(3)(i), Arizona Rules of Criminal Procedure, 17 A.R.S.

The information found in the Phoenix telephone book by Juror Clemmer clearly qualifies as evidence not properly admitted during the trial. Rule 24.1(c)(3)(i), Arizona Rules of Criminal Procedure, 17 A.R.S. Our Court of Appeals has stated:

"The jury may consider only matter that has been received in evidence and any breach of this principle should not be condoned if there is the slightest possibility that harm could have resulted." *State v. Turrentine*, 122 Ariz. 39, 41, 592 P.2d 1305, 1307 (App.1979).

The question is whether the fact that this evidence was before the jury requires reversal. Not all extraneous information is so prejudicial as to require reversal. The standard enunciated by the Ninth Circuit is that the defendant is entitled to a new trial if it cannot be concluded beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict. *United States v. Vasquez*, 597 F.2d 192 (9th Cir. 1979); *Gibson v. Clanon*, 633 F.2d 851 (9th Cir. 1980) cert. denied 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981). We adopt the reasonable possibility standard applied by the Ninth Circuit as an appropriate balancing test and in harmony with the standards applied in other circuits. See, e.g., *Bulger v. McClay*, 575 F.2d 407 (2nd Cir. 1978), cert. denied sub. nom. *Ward v. Bulger*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263, "Significant possibility of prejudice"; *Virgin Islands v. Gereau*, 523 F.2d 140 (3rd Cir. 1975), cert. denied 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976), "prima facie incompatible with the Sixth Amendment"; *United States v. Marx*, 485 F.2d 1179 (10th Cir. 1973), cert. denied 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974), "slightest possibility that harm could have resulted"; *United States v. Thomas*, 463 F.2d 1061 (7th Cir. 1972) and *Osborne v. United States*, 351 F.2d 111 (8th Cir. 1965), "might have operated to the substantial injury of the defendant"; *Farese v. United States*, 428 F.2d 178 (5th Cir. 1970), "reasonable possibility that information affected the verdict."

The finding of four Mark Harrises in the Phoenix telephone book does not appear to have had any prejudicial impact on the minds of the jurors, and we can conclude beyond a reasonable doubt that information concerning Phoenix Tent and Awning did not contribute to the verdict. *Vasquez*, supra.

A more serious matter, however, concerns evidence of defendant's prior convictions. Prior to trial, the trial court ruled to exclude, as prejudicial, evidence of defendants' prior federal convictions. The defendants' federal convictions for robbery and kidnapping were based upon evidence leading up to the state prosecution for murder. Evidence of the prior convictions did not come in at trial, although there were references by both parties to prior proceedings related to the case. Nevertheless, evidence developed at the hearing on the motion for new trial indicated that some of the jurors found out that the defendants had been convicted in the prior proceedings and were currently serving sentences. Several jurors were called regarding this information. Juror Gail Lynn Peoples testified:

"Q You have provided an Affidavit to the Court detailing occurrences which you observed during the jury deliberations in that particular matter?

"A Yes, sir.

"Q Mrs. Peoples, without indicating in detail what you have already supplemented to the Court or submitted to the Court, during the course of the deliberations, were statements made concerning the prior conviction of Michael Poland and Patrick Poland?

"A Yes, they were.

"Q Do you recall when those statements were made?

"A They were made—I do recall specifically that they were made on the first day of deliberation, which was Friday, I believe, and I am not sure about

Saturday, but I know for sure on Friday.

"Q Drawing your attention to that Friday, which was the day after Thanksgiving, could you describe for the Court the context in which these discussions concerning or the mention of the prior conviction came up?

"A Okay, at that point the vote was ten to two—

\* \* \* \* \* \*

"Q Describe for the Court the context in which the mention of the prior conviction first came up on Friday?

"A Exactly what was said, is that what you mean?

"Q Yes.

"A I am not sure who initiated the statement. I know that Mrs. Clemmer did say that it isn't as if they were going to go free, because they have already been sentenced to a hundred years.

"Q Did she say anything further along that line?

"A No, that is all I recall.

"Q Did this discussion occur early in the day or late in the day?

"A Late.

\* \* \* \* \* \*

"Q When did the mention of the prior conviction come up again?

"A Okay. I don't remember exactly who said it or what exactly was said, but there were comments made about it. One of the jurors said if they were found guilty before, then the other jury must have had more evidence than we have.

"Q Do you recall on what day this discussion occurred?

"A I believe it was on Saturday."

And Orval Anderson testified:

"Q Mr. Anderson, during the course of the deliberations, did the subject of the prior conviction of the Poland brothers come up?

"A Yes, at one time it did.

\* \* \* \* \* \*

"THE COURT: Did you say that you did not recall who made the statement—do you have any recollection at all who may have made it?

"THE WITNESS: You mean the statement about the prior?

"THE COURT: Yes.

"THE WITNESS: No, your Honor, I can't remember who said—the only reason I can remember it, they were trying to get me to change my decision and it had nothing to do with my decision, but I can't remember.

"THE COURT: Now, were you one of the jurors, Mr. Anderson, who in the selection process testified that you had some recollection of a prior proceeding?

"THE WITNESS: No."

Two other jurors, Green and Markides, testified that the defendants' prior convictions were discussed.

On the contrary, Juror Phyllis Clemmer testified:

"Q And were you present during the two days of deliberation, ma'am?

"A Yes.

"Q Were you present for the entire deliberative process?

"A Yes, I was.

"Q When you went into that jury room, did you know that there had been in fact another trial and that the defendants had in fact been convicted?

"A No, I did not.

"Q At any time during the two days, ma'am, at which you were in the jury room, did you ever overhear anyone else say that these defendants had been convicted in another trial?

"A No, I did not.

"Q And specifically, Mrs. Clemmer, did you ever say, to yourself, Phyllis Clemmer ever say that they weren't going free because they had already served a hundred years in federal court?

"A No, I did not say that because I didn't know it."

Jurors Tackitt, Cutbirth, Herman, Wright, Robertson, and Lorencen also testified that the matter had never come up during juror deliberations. There were, then, 4 jurors who testified that mention of the defendants' prior convictions had been discussed

during juror deliberations and 7 testified that no mention was made of the prior convictions. Defendants urge that the presence of this inadmissible evidence during deliberations requires a new trial and we agree.

Since the federal convictions were based on the same series of acts as were at issue in the state prosecution, evidence of the prior convictions is inherently prejudicial. Testimony of several of the jurors indicates that the information was mentioned in the jury room. The knowledge that another jury considered the same evidence against defendants and found them guilty was bound to have influence on the jury. We cannot conclude beyond a reasonable doubt that this evidence did not contribute to the verdict. *Vasquez*, supra. The matter will have to be reversed and remanded for a new trial.

### AGGRAVATING CIRCUMSTANCES

In sentencing defendants, the trial judge found the following aggravating circumstance to exist:

"13–454(E)(6). The defendant committed the offense in an especially heinous, cruel, or depraved manner."

Finding no mitigating circumstances sufficiently substantial to call for leniency, the trial court imposed the death penalty pursuant to A.R.S. § 13–454(D).

In interpreting the aggravating circumstance that the offense was committed in an especially heinous, cruel, or depraved manner, we have stated:

"* * * the cruelty referred to in the statute involved the pain and the mental and physical distress visited upon the victims. Heinous and depraved as used in the same statute meant the mental state and attitude of the perpetrator as reflected in his words and actions." *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980), cert. denied 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612.

 We do not believe that the evidence so far produced in this case shows that the murders were cruel. We have interpreted "cruel" as "disposed to inflict pain esp. in a wanton, insensate or vindic-

tive manner: sadistic." *State v. Lujan*, 124 Ariz. 365, 372, 604 P.2d 629, 636 (1979), quoting Webster's Third New International Dictionary. There was no evidence of suffering by the guards. The autopsy revealed no evidence that they had been bound or injured prior to being placed in the water, and there was no sign of a struggle. Cruelty has not been shown beyond a reasonable doubt. *State v. Lujan*, supra; *State v. Ortiz*, Ariz., 639 P.2d 1020 (1981); *State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1980); *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977), cert. denied 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

Neither does the evidence support a finding that the murders were heinous or depraved. These terms were defined in *State v. Lujan*, supra:

"heinous: hatefully or shockingly evil: grossly bad

\* \* \* \* \* \*

"depraved: marked by debasement, corruption, perversion or deterioration." 124 Ariz. at 372, 604 P.2d at 636.

The issue focuses on the state of mind of the killer. *State v. Lujan*, supra. The difficulty in making this determination in the case at bar is that there is very little evidence in the record of the exact circumstances of the guards' deaths. Although defendants' state of mind may be inferred from their behavior at or near the time of the offense, *State v. Lujan*, supra, we know nothing of the circumstances under which the guards were held hostage.

The State must prove the existence of aggravating circumstances beyond a reasonable doubt. *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825, cert. denied 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). We do not believe it has been shown beyond a reasonable doubt that the murders were committed in an "especially heinous, cruel or depraved manner."

 We do note, however, that the trial court mistook the law when it did not find that the defendants "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–454(E)(5). In so holding, the trial judge stated:

"5. The court finds the aggravating circumstance in § 13–454E(5) is not present. This presumes the legislative intent was to cover a contract killing. If this presumption is inaccurate, the evidence shows the defendants received something of pecuniary value, cash in the amount of $281,000.00.

"This, then, would be an aggravating circumstance."

It was not until after the trial in this case that we held, in *State v. Clark*, supra, that A.R.S. § 13–454(E)(5) was not limited to "murder for hire" situations, but may be found where any expectation of financial gain was a cause of the murder. Upon retrial, if the defendants are again convicted of first degree murder, the court may find the existence of this aggravating circumstance.

Reversed and remanded for new trial pursuant to this opinion.

HOLOHAN, C. J., GORDON, V. C. J., and HAYS and FELDMAN, JJ., concur.