NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

MICHAEL J. STARKOVICH, *Appellant*.

No. 1 CA-CR 17-0004
No. 1 CA-CR 17-0011
(Consolidated)
FILED 8-21-2018

Appeal from the Superior Court in Maricopa County
No.  CR2011-163536-001
No.  CR2013-002144-004
The Honorable George H. Foster Jr., Judge
The Honorable John R. Ditsworth, Judge (Retired)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michelle L. Hogan
*Counsel for Appellee*

Stanley M. Slonaker Attorney at Law, Phoenix
By Stanley M. Slonaker
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge Jon W. Thompson joined.

---

**B R O W N,** Judge:

¶1 Michael J. Starkovich appeals his convictions and sentences for one count of possession of marijuana of four pounds or more and one count of money laundering in the second degree. Starkovich argues the trial court erred in refusing to suppress (1) evidence obtained pursuant to what he deems an invalid search warrant; (2) evidence obtained in a search initiated prior to issuance of a search warrant; and (3) statements elicited in violation of his constitutional rights. For the following reasons, we affirm.

## BACKGROUND

¶2 Police officers found large quantities of marijuana and cash in Starkovich's home consistent with drug trafficking. When questioned, he admitted to selling marijuana. The State charged him with one count of possession of marijuana for sale and one count of money laundering in the second degree. A jury found him guilty of the lesser-included offense of possession of marijuana of a weight of four pounds or more, but could not reach a unanimous decision regarding money laundering. Starkovich waived his right to a jury trial and stipulated to proceeding to a bench trial on the remaining money laundering charge. Following the bench trial, the court found him guilty of money laundering in the second degree. After sentencing, he filed a timely notice of appeal.

## DISCUSSION

### I.   Validity of Search Warrant

¶3 Prior to the jury trial, Starkovich moved to suppress all evidence obtained pursuant to what he asserts was an invalid search warrant. At the two-day suppression hearing, police officers testified they received a tip that Starkovich trafficked marijuana out of his home. On April 18, 2013, officers conducted "physical surveillance" at his home and used a pole surveillance camera as an investigative aid. The camera captured images of the front of his home but did not reveal the innermost portion of the carport.

¶4 Officers saw multiple vehicles coming and going from Starkovich's home. As the officers started their physical surveillance, they observed a Honda that was "backed up into the carport." Shortly thereafter they watched Starkovich, who was in a wheelchair, get into a van and drive away at the same time E.K. was leaving in the Honda.

¶5 Starkovich and E.K. met up with a third person, B.F., driving an Impala. E.K. and B.F. switched vehicles and, with Starkovich following behind, E.K. drove the Impala back to Starkovich's home. E.K. backed into the carport for a short time and then returned the Impala to B.F. Officers believed this to be a "blind delivery," which allows the buyer to mask the final location of the drugs from the seller. An officer stopped B.F. in the Impala, but saw no indicia of drug activity in the vehicle.

¶6 After E.K. returned to Starkovich's home, officers observed D.W. and R.A. arrive in a Pontiac, carry a bag inside, and then leave with a bag. Officers stopped the Pontiac and found a bag containing four pounds of marijuana separated into two bags, additional bags of marijuana, hashish, drug packaging and sales materials, drug paraphernalia, large amounts of cash, and a handgun.

¶7 D.W. admitted to buying four pounds of marijuana to split between himself and R.A. but would not say who sold him the marijuana. Although he initially denied involvement, R.A. told officers that D.W. bought marijuana from a man in a wheelchair and gave Starkovich's street name as the location of purchase. R.A. claimed he only acted as protection for D.W. and was in another room when the exchange occurred. R.A. claimed D.W. simply gave him the bag to carry and he did not buy any of the marijuana.

¶8 Officers went to Starkovich's home and contacted Starkovich and E.K.[1] Another individual, G.V., attempted to flee the scene, but was later detained. Officers then conducted a protective sweep of the home.

¶9 The lead detective, or affiant, prepared the search warrant affidavit. The affiant described the short-term traffic at Starkovich's home, the activity involving the Impala, the results of the search of the Pontiac, a summary of the statements provided by R.A. and D.W., G.V.'s attempt to flee the scene prior to the protective sweep, and the affiant's training and experience in drug enforcement.

---

[1] The State charged Starkovich, R.A., D.W., and E.K. as co-defendants. The record does not show the final disposition of the co-defendants' cases.

¶10 The affidavit also stated Starkovich was "arrested in 2011 for possession of marijuana for sale. He pled guilty and is currently on probation for that offense." At the hearing, the affiant testified he later learned Starkovich pled guilty to a reduced offense of possession of marijuana. The affidavit also indicated officers discovered the same bag in the Pontiac that R.A. carried out of Starkovich's home. The affiant testified he believed this information to be accurate, and R.A. linked the marijuana in the bag to Starkovich. The affiant explained that he watched R.A. leave Starkovich's house on his smartphone via pole camera surveillance and testified the bag R.A. was carrying appeared to be black, but later acknowledged the bag also had "white flowers" on it.

¶11 The affiant did not include the following: (1) officers did not observe any criminal activity at Starkovich's home prior to April 18, 2013; (2) officers did not see any items placed in the Impala or Honda while backed into the carport; (3) officers stopped the Impala and found no drug evidence; (4) no vehicles, aside from the Impala and Pontiac, were stopped after leaving the home; (5) officers discovered additional marijuana, hashish, and large amounts of cash not directly linked to Starkovich in the Pontiac; and (6) R.A. initially denied involvement in any criminal activity. The affiant testified he believed the omitted information was either irrelevant, unsubstantiated, or part of an ongoing investigation.

¶12 Officers gave conflicting testimony regarding the timing of the search and the record is similarly unclear. On an audio recording from the scene that day, officers stated the magistrate signed the search warrant as early as 6:32 p.m.[2] The timestamp from the fax machine indicated the magistrate faxed the signed search warrant to the affiant at 6:47 p.m. The affiant noted, however, he could not be positive regarding the accuracy of the time on the fax machine where the warrant was sent. The affiant's police report stated that officers served the search warrant at 6:50 p.m. At the suppression hearing, Starkovich called an expert in forensic reconstruction who testified, based upon his review of the evidence, that he believed the search started as early as 6:39 p.m. The expert acknowledged a possible margin of error with this estimation.

¶13 Nonetheless, the affiant testified he faxed the affidavit to the magistrate, received the signed search warrant, and then called officers at Starkovich's home to inform them the magistrate had signed the search

---

[2] Although the parties refer to the judicial officer who signed the search warrant as a "magistrate," she was a Maricopa County Superior Court commissioner.

warrant. Officers who were present at the home testified the search did not occur until the magistrate signed the search warrant. In Starkovich's home, officers found six bags of marijuana, drug sales materials, and over $760,000 in cash. In the Honda, they discovered over 40 pounds of marijuana.

¶14 The trial court denied Starkovich's request to suppress the evidence obtained pursuant to the search warrant, finding the facts supported authorization of the search warrant, and the search did not occur prior to issuance of the search warrant.

### A. Search Warrant Affidavit

¶15 Starkovich argues the search warrant affidavit omitted material facts, contained false or misleading information, and the search warrant would not be supported by probable cause without the false or omitted information.

¶16 We review the trial court's factual findings as to whether the affiant deliberately included false statements or omitted material facts under the clearly erroneous standard. *State v. Buccini*, 167 Ariz. 550, 554 (1991). We review the court's legal conclusions as to whether an accurate and complete affidavit would still be sufficient to establish probable cause de novo. *Id.* at 555-56. We may only consider evidence presented at the suppression hearing, and "we view it in the light most favorable to sustaining the trial court's ruling." *State v. Gay*, 214 Ariz. 214, 217, ¶ 4 (App. 2007). Moreover, in cases where "two interpretations of an affidavit may be equally reasonable, we will not hold as a matter of law that the court below erred in finding the affidavit sufficient." *State v. Richardson*, 22 Ariz. App. 449, 452 (1974).

¶17 As established in *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant is entitled to challenge a search warrant affidavit if he makes a substantial preliminary showing that (1) the affiant knowingly, intentionally, or with reckless disregard for the truth included a false statement in the search warrant affidavit; and (2) the excision of the false statement or inclusion of the omitted facts renders the search warrant void of probable cause. *See State v. Carter*, 145 Ariz. 101, 108-09 (1985) (adding deliberately or recklessly omitted material facts with the intent to mislead the magistrate to the *Franks* analysis); *Frimmel v. Sanders*, 236 Ariz. 232, 239, ¶ 27 (App. 2014). A defendant must prove the first prong of this test by a preponderance of the evidence before the court moves to the second prong. *Buccini*, 167 Ariz. at 554-56; *see also Carter*, 145 Ariz. at 109 ("Merely innocent or negligent mistakes . . . will not satisfy the first prong of the *Franks* test.").

**¶18**        If the first prong is met, the trial court "must redraft the affidavit by deleting falsehoods and adding the omitted material facts" before determining the existence of probable cause. *Buccini*, 167 Ariz. at 554-56. For this analysis, courts employ the flexible approach adopted in *Illinois v. Gates*, 462 U.S. 213, 239 (1983). Probable cause exists if the facts in the redrafted affidavit establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Facts may include hearsay statements, *State v. Poland*, 132 Ariz. 269, 280 (1982), as well as "the collective knowledge of all of the law enforcement agents involved in the operation and may be viewed in light of an officer's past experiences which enable him to interpret the actions of the surveilled person," *State v. Olson*, 134 Ariz. 114, 117 (App. 1982) (citation omitted); *Richardson*, 22 Ariz. App. at 450-52 (holding that the affidavit contained sufficient probable cause where the affiant explained unusual activity was indicative of drug trafficking based upon his experience). If the redrafted affidavit lacks probable cause, the evidence seized as a direct result of the search warrant must be excluded at trial. *Poland*, 132 Ariz. at 279.

**¶19**        In this case, the omitted fact that officers found no drug evidence in the Impala after the "blind delivery" merely corroborated that B.F. had transferred marijuana to Starkovich and E.K through their receipt of the Impala. The affiant testified he did not include the information regarding the stop of the Impala because of an ongoing investigation related to B.F. Thus, the lack of drug evidence in the Impala was immaterial and the affiant did not omit this fact with the intent to mislead the magistrate.

**¶20**        The omitted fact that D.W. and R.A. possessed additional items linking them to drug sales was immaterial. The record shows D.W. and R.A. bought marijuana from Starkovich and any additional information that they were personally involved in drug sales would be superfluous and implied from the facts listed within the affidavit. In any event, the affidavit mentioned that D.W. and R.A. possessed a handgun, packaging materials, and sales ledgers, all of which indicated to the magistrate that D.W. and R.A. were personally involved in drug sales.

**¶21**        Even though the affiant omitted that R.A. initially denied involvement, the affidavit stated that R.A. denied purchasing marijuana, contrary to what D.W. claimed. Moreover, nothing from the record indicates that D.W. and R.A. acted as informants or received any benefit from speaking with officers. *See State v. Summerlin*, 138 Ariz. 426, 431 (1983) (discussing how most informants are individuals seeking favor with officers by providing information). The affiant's omission regarding R.A.'s

initial denial did not falsely bolster his statements, mask inconsistencies between D.W.'s and R.A.'s narratives, or omit information regarding their work as informants.

¶22        Similarly, omissions that officers did not stop every vehicle leaving Starkovich's home, did not see items placed within vehicles parked directly under the carport, and did not observe criminal activity at his home prior to April 18, 2013 were immaterial. This information can be drawn from a common sense reading of the affidavit and did not paint a false picture of Starkovich's criminal activity.

¶23        The affiant admitted he did not know Starkovich had pleaded guilty to a lesser offense at the time he drafted the affidavit. Although the affidavit incorrectly implied Starkovich pleaded guilty to possession of marijuana for sale, it accurately reflected his probation status and his prior arrest for drug sales. This error was "innocent or negligent" at most and it did not falsely characterize the nature of the arrest. *Carter*, 145 Ariz. at 109.

¶24        The affiant also testified the bag used by D.W. and R.A. appeared to be black, and he believed the bag found in the Pontiac matched the bag R.A. carried out of Starkovich's home. The record does not clearly indicate the affiant provided false information regarding the bag, and, in any event, R.A. admitted the bag in the Pontiac contained marijuana linked to Starkovich.

¶25        Under these circumstances, Starkovich cannot meet the first prong of the *Franks* test, and the trial court did not clearly err in refusing to suppress evidence obtained pursuant to the search warrant. The affiant did not intend to create a misleading affidavit or falsely characterize Starkovich's role in the course of conduct described within the affidavit. *See Carter*, 145 Ariz. at 109; *Frimmel*, 236 Ariz. at 239, ¶ 27.

¶26        Furthermore, Starkovich did not demonstrate that a redrafted affidavit under the second prong of the *Franks* test would lack probable cause. If we incorporate and correct any omitted or misstated facts, the affidavit would still show the following:

- Starkovich's residence incurred short-term car traffic indicative of drug trafficking.

- Numerous vehicles came to the Starkovich's home, of which two were stopped, and one contained drug evidence.

- Officers observed a "blind delivery" from the Impala to Starkovich's home.

- Starkovich's associates, D.W. and R.A., possessed additional marijuana, hashish, and cash.

- Although R.A. initially denied involvement, he provided statements linking Starkovich to marijuana found in the Pontiac.

- No items were seen taken from or placed in the Impala, where the trunk was largely concealed by a carport.

- Officers believed the bag R.A. used to carry marijuana from Starkovich's home matched the bag found in the Pontiac, although they could not be certain of its color.

- An individual attempted to flee from Starkovich's home when officers arrived.

- Starkovich had previously been arrested for possession of marijuana for sale, but ultimately pled guilty to possession of marijuana and was on probation for that offense.

The redrafted affidavit demonstrates a "fair probability" that Starkovich trafficked marijuana out of his home. *Gates*, 462 U.S. at 239. Thus, the trial court did not err in finding the affidavit contained sufficient facts to authorize a search warrant.

## B. Timing of Search

¶27 Starkovich argues the search of his home occurred prior to the issuance of the search warrant. Relying heavily upon the search warrant's timestamps, he contends the search occurred approximately 30 minutes before the magistrate faxed the signed search warrant to the affiant.

¶28 We will not disturb the trial court's factual findings absent a clear abuse of discretion. *State v. Crowley*, 202 Ariz. 80, 83, ¶ 7 (App. 2002). "Accordingly, we will defer to the trial court's assessment of witness credibility because the trial court is in the best position to make that determination." *State v. Olquin*, 216 Ariz. 250, 252, ¶ 10 (App. 2007) (citing *State v. Estrada*, 209 Ariz. 287, 292, ¶ 22 (App. 2004)).

¶29       Here, the trial court explained that officers approached the house while a search warrant was being requested. The court found that "[p]eople began running from the house" and officers "conducted a true protective sweep throughout the house. They secured the home and all officers returned outside." Officers started to speak with Starkovich in his driveway, but they moved to the rear patio to tape the interview. The court concluded that the officers "did not begin to search the home until the warrant was obtained."

¶30       We defer to the trial court's determinations regarding witness credibility, *see Olquin*, 216 Ariz. at 252, ¶ 10, particularly as to the officers' testimony regarding the timeline of the protective sweep and the subsequent search. Officers testified they conducted a quick protective sweep, exited the home, and waited to conduct the search until they received a phone call advising them that a magistrate had signed the search warrant. Although controverting evidence was also presented, *supra* ¶¶ 12-13, it is not our role to reweigh the evidence; therefore, we cannot say the court abused its discretion in finding that the protective sweep and the subsequent search were lawfully conducted.

## II.    Pre- and Post-*Miranda* Statements

¶31       Starkovich moved to suppress all statements elicited by police officers, arguing they were obtained in violation of his constitutional rights. At the suppression hearing, an assisting detective testified that during the protective sweep, he stood next to Starkovich under the open carport and they had a "casual" initial conversation. Starkovich was not handcuffed and sat next to the detective in a wheelchair. The detective informed Starkovich of the sweep and asked if any individuals or weapons were in the home. Starkovich then told the detective, "there's only a little weed, about a pound of weed in the house." During that initial conversation, the detective told Starkovich he would try to help him if Starkovich remained truthful, but the detective testified he did not make any promises regarding an arrest or possible jail time. The detective explained that the initial conversation was not meant to be an interview, he did not record the conversation, and the focus was to keep Starkovich "comfortable" and "updated as to the process."

¶32       Starkovich asked the detective if they could speak in the backyard for the formal interview. At approximately 6:19 p.m. the detective read Starkovich *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Starkovich acknowledged he understood the warnings, but did not immediately agree to speak with the detective. The detective noted he

9

could give Starkovich time to decide and asked for basic information, including Starkovich's name, address, and date of birth. After discussing that information, Starkovich agreed to speak and admitted he had marijuana and around $600,000 to $700,000 in his home. Starkovich admitted he sold marijuana to dispensaries. Declining to suppress any of Starkovich's statements, the trial court found that officers provided proper *Miranda* warnings and did not use threats or coercive behavior.

¶33 Starkovich argues the trial court erred in refusing to suppress all statements made before and after officers provided *Miranda* warnings. He argues he was in custody for purposes of *Miranda* when officers contacted him in his carport, was unlawfully interrogated prior to receiving his *Miranda* warnings, and, regardless of the reading of his *Miranda* warnings, all subsequent questioning was similarly unlawful.

¶34 We review a trial court's ruling upon the admissibility of a defendant's statements for abuse of discretion. *Gay*, 214 Ariz. at 223, ¶ 30. We only consider evidence presented at the suppression hearing, and we view the evidence in the light most favorable to sustaining the ruling. *Id.* (citation omitted.) We review de novo the court's legal conclusions. *Id.* "We are required to affirm a trial court's ruling if legally correct for any reason . . .." *State v. Boteo-Flores*, 230 Ariz. 551, 553, ¶ 7 (App. 2012).

¶35 "[L]aw enforcement officers must provide the well-known *Miranda* warnings before interrogating a person in custody." *State v. Maciel*, 240 Ariz. 46, 49, ¶ 10 (2016) (citing *Miranda*, 384 U.S. at 478-79). Even assuming Starkovich was in custody prior to being given *Miranda* warnings, Starkovich's response to the detective's question regarding weapons is admissible nonetheless if it fits within the "public safety exception." *See New York v. Quarles*, 467 U.S. 649, 655–59 (1984). That exception allows into evidence a statement made by an un-*Mirandized* suspect when answering "questions necessary to secure the[] [officers'] own safety or the safety of the public." *Id.* at 658-59. Whether questioning falls within the public safety exception turns on "whether there was an objectively reasonable need to protect the police or the public from any immediate danger." *State v. Ramirez*, 178 Ariz. 116, 124 (1994) (quoting *United States v. Brady*, 819 F.2d 884, 888 n.3 (9th Cir. 1987)).

¶36 The initial conversation between Starkovich and the detective falls within the public safety exception. Before asking Starkovich whether any individuals or weapons were in the home, it was suspected "there was a large quantity of drugs involved, and any time there is a large quantity of drugs involved, it's usually protected by handguns." Additionally, officers

had already encountered "a handgun in the traffic stop," and one individual had fled the residence. The detective who asked Starkovich the question testified he did it "for officer safety" because the "house had not been searched yet" and he "fear[ed] . . . being in front of a suspected drug house where individuals were just seen running from . . . and want[ed] to protect [him]self." Accordingly, the question asked fits squarely within the public safety exception because its purpose was to secure the officers from any immediate danger.

¶37 Because the initial statements did not violate *Miranda*, Starkovich's post-*Miranda* statements need not be suppressed based upon *Missouri v. Seibert*, 542 U.S. 600, 604, (2004).[3] *See Maciel*, 240 Ariz. at 52, ¶ 29 (finding that because the earlier questioning did not violate *Miranda*, it was unnecessary to address defendant's "argument that, because his earlier statements violated *Miranda*, his post-arrest statements should also have been suppressed based on *Missouri v. Seibert*"). The record shows Starkovich was properly *Mirandized*, understood the warnings, and voluntarily spoke with the detective. Accordingly, the court did not err in refusing to suppress Starkovich's pre- and post-*Miranda* statements.

## CONCLUSION

¶38 For the foregoing reasons, we affirm Starkovich's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[3] In *Seibert*, the court held that a "two-step" interrogation technique designed to elicit a pre-*Miranda* confession gave the "impression that the further questioning was a mere continuation of the earlier questions" and both pre- and post-*Miranda* statements were inadmissible. *Id.* at 616-17.