45 P.3d 1224

**STATE of Arizona, Appellee,**

v.

**Luke Jaret SCHINZEL, Appellant.**

**No. 1 CA–CR 00–0996.**

Court of Appeals of Arizona, Division 1, Department B.

May 9, 2002.

Janet Napolitano, Attorney General By Randall M. Howe, Chief Counsel, Criminal Appeals Section and Katia Mehu, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender By Spencer D. Heffel, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

TIMMER, Presiding Judge.

¶ 1 Luke Jaret Schinzel appeals from his convictions and sentences for possession of drug paraphernalia, possession of marijuana, and two counts of forgery, challenging the trial court's rulings on his motion to suppress. We are asked to decide whether the trial court erred by refusing to suppress Schinzel's answers to police inquiries made after his arrest but prior to advising him of his *Miranda* rights and concerning an offense unrelated to the one underlying his arrest. We are additionally asked to determine whether the court erred by declining to suppress evidence obtained during a search of a dresser in Schinzel's girlfriend's apartment and from questioning Schinzel after he had waived his *Miranda* rights. For the reasons that follow, we reverse and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In April 2000, Phoenix Police Officer Georgia Sevcou investigated complaints that an apartment leaseholder, Tara Montoya, was engaging in illegal drug activities and allowing her boyfriend to reside with her, although he was not listed on the lease. In the course of her investigation, Officer Sevcou and other officers contacted Montoya at her apartment. Montoya permitted Officer Sevcou to look around the apartment, but the officer saw no evidence of drug activity. Montoya did admit that she had outstanding traffic warrants, though, and was given "a two-week reprieve" to take care of them.

¶ 3 Schinzel was present in the apartment during this time, and Montoya identified him as her boyfriend. Officer Sevcou asked other officers to obtain identifying information from Schinzel, and he provided a false name. When Officer Sevcou later returned to the apartment to ascertain Schinzel's true identity, he had left.

¶ 4 On the morning of May 3, 2000, Officer Sevcou and plain-clothes detectives returned to the apartment to arrest Montoya because her warrants remained outstanding. Officer Sevcou also planned to confirm the absence of drug activity and, if possible, ascertain Schinzel's identity.

¶ 5 Officers McCauley and Luney, dressed as maintenance workers, went to Montoya's apartment, knocked on the door, and spoke to Schinzel after he had opened it. Schinzel sent Montoya to the door to confirm her leaseholder status to the "workers," who then asked Montoya if they could examine her thermostat. When she answered affirmatively and invited them inside, Officer McCauley grabbed her arm, identified himself as a police officer, and arrested her for the outstanding warrants. Officer Sevcou then entered the apartment and took charge of Montoya, who went to a back bedroom to change from her night clothes.

¶ 6 Officer McCauley turned to Schinzel and asked for his name, which Schinzel eventually disclosed. Upon learning that Schinzel

had outstanding warrants, Officer Luney placed him in handcuffs and directed him to sit in a chair in the front room of the apartment.

¶ 7 Officer Siekmann then entered the apartment and stood near a dresser also located in the front room. The officer spotted glass pipes "commonly used in smoking methamphetamine directly on top of the dresser in plain view." He asked Schinzel if the dresser belonged to him, and Schinzel answered affirmatively. Officer Siekmann next asked if Schinzel owned the glass pipes, and Schinzel again replied affirmatively. The officer then asked Schinzel whether there were "any other drugs inside of the apartment," and Schinzel answered that drugs were located in the top dresser drawer. After obtaining Schinzel's permission to remove the drugs from the dresser, Officer Siekmann opened the drawer and pulled out a plastic bag containing a white, crystal-like substance that he believed to be methamphetamine. Schinzel then declared that there was also a baggie of marijuana inside the same drawer, which the officer retrieved.

¶ 8 Officer Siekmann also found in the drawer a wallet and loose checks, which were not in Schinzel's name. He asked Schinzel if the checks belonged to him, and Schinzel replied that he had found them. He next asked Schinzel if he wanted to take the wallet to jail with him, and Schinzel said that he did. An "inventory search" of the wallet disclosed two Arizona identification cards bearing Schinzel's photograph but not his name.

¶ 9 Eventually, the police transported Schinzel to the precinct where, for the first time, they advised him of his Miranda[1] rights. Schinzel waived his right to remain silent and answered questions about the checks and the identification cards. The State ultimately charged Schinzel with possession of dangerous drugs, possession of drug paraphernalia, possession of marijuana and two counts of forgery.

¶ 10 Prior to trial, Schinzel moved the court to preclude his statements to the officers and suppress the evidence seized at the time of his arrest. After conducting an evidentiary hearing, the court found that Officer Siekmann's questions regarding Schinzel's ownership of the dresser and pipes were investigatory and were therefore properly asked without first advising Schinzel of his Miranda rights. The court found that after Schinzel had answered these questions, however, the officer's questions turned to custodial interrogation. Because Schinzel had not been advised of his Miranda rights before answering these questions, the court precluded their admission during the State's case-in-chief. The court also suppressed evidence of the methamphetamine because Officer Siekmann had located it only by his wrongful questioning of Schinzel, but it denied the request to suppress evidence of the marijuana, the checks, and the wallet based on its finding that the officer had discovered them as a result of Schinzel's unsolicited comments. The court also ruled that the pipes were admissible because they were in "plain view," and it declined to preclude admission of Schinzel's statements made after the police had informed him of his Miranda rights.

¶ 11 The State dismissed the charge of possessing methamphetamine. A jury convicted Schinzel of the remaining counts. This appeal followed.

## STANDARD OF REVIEW

¶ 12 We review the trial court's ruling for a clear abuse of discretion, *State v. Acinelli*, 191 Ariz. 66, 69, 952 P.2d 304, 307 (App.1997), considering only the evidence presented at the suppression hearing. *State v. Spears*, 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996). While we view this evidence in the light most favorable to sustaining the trial court's ruling, *State v. Stanley*, 167 Ariz. 519, 525, 809 P.2d 944, 950 (1991), we review de novo the court's legal conclusions. *State v. Sanchez*, 200 Ariz. 163, 165, ¶ 5, 24 P.3d 610, 612 (App.2001).

## DISCUSSION

### I. Statements regarding the ownership of the dresser and pipes

¶ 13 Schinzel first argues that the trial court erred by refusing to suppress his

---

1. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

admissions to the police that he owned the dresser and pipes. He contends that because Officer Siekmann conducted a custodial interrogation by asking Schinzel about the dresser and pipes without first advising him of his *Miranda* rights and securing a waiver, admission of the statements violated Schinzel's rights against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution and Article 2, Section 10 of the Arizona Constitution.[2] The State counters, and the trial court agreed, that even though Schinzel was in custody at the time Officer Siekmann posed his questions, because the inquiry was merely investigatory, the police were not required to first advise Schinzel of his *Miranda* rights. To resolve this issue, we must discern where the line is drawn between "custodial interrogation" and an "investigatory inquiry" when questions are directed to a person in custody for an offense unrelated to the subject of the inquiry.

¶ 14 In *Miranda*, the Court held that police officers must inform a suspect of enumerated constitutional rights prior to conducting a "custodial interrogation." 384 U.S. at 444, 86 S.Ct. 1602. It explained, however, that its decision was "not intended to hamper the traditional function of police officers in investigating crime." *Id.* at 477, 86 S.Ct. 1602. Consequently, the Court held as follows:

> When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforce-

ment. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Id.* at 477–78, 86 S.Ct. 1602.

¶ 15 The State seizes on this aspect of *Miranda* and argues that Officer Siekmann's questions were the type of on-the-scene questioning described by *Miranda* and exempted from its holding. It contends that because the pipes could have belonged to either Schinzel or Montoya, the questions were necessarily investigatory. Thus, the State asserts, until the police had sufficient facts to arrest someone for possessing the pipes, its questions were merely part of a preliminary investigation. The trial court agreed with the State, ruling that the questions were investigatory because the police did not have probable cause to arrest Schinzel for possession of drug paraphernalia at the time.

¶ 16 As reflected in *Miranda, see supra* ¶ 14, the Court described the type of exempted on-the-scene questioning as including inquiries of "persons not under restraint." Because Schinzel was indisputably "under restraint" when questioned, it would not appear at first glance that Officer Siekmann's inquiry was merely "investigatory." Indeed, if the officer had asked Schinzel about the offense underlying his arrest, *Miranda* would unquestionably apply to suppress Schinzel's answers. But, as the State points out, this case adds a unique wrinkle to our analysis because the officer questioned Schinzel about a crime unrelated to the reason for his arrest, and the police did not have probable cause to arrest Schinzel for committing that offense. We therefore consider whether these circumstances were sufficient to relieve the police from advising Schinzel of his *Miranda* rights before questioning him about the dresser and the pipes.

---

2. We summarily reject Schinzel's additional contention that the admission of the evidence violated his right to counsel under the Sixth Amendment to the United States constitution. The right to counsel attaches only at the commencement of judicial criminal proceedings. *Moore v. Illinois*, 434 U.S. 220, 226–27, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977). Because the police elicited the contested statements prior to the initiation of charges against Schinzel, his Sixth Amendment right to counsel was not implicated. Although Schinzel also contends that admission of the evidence violated his right to counsel under Article 2, Section 24 of the Arizona Constitution, he does not assert that this section provides more extensive rights than the Sixth Amendment. We therefore decline to undertake this examination.

¶ 17 Two years after deciding *Miranda*, the Court held that a government agent was required to advise a prisoner of his rights before questioning him about a tax matter that was unrelated to the prisoner's reason for incarceration. *Mathis v. United States*, 391 U.S. 1, 2–3, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). The government in *Mathis* had argued that *Miranda* did not apply because (1) the questions were asked as part of a routine tax investigation that might not lead to criminal proceedings, and (2) the agent's inquiries were unrelated to the reason for the prisoner's incarceration. *Id.* at 4, 88 S.Ct. 1503. The Court rejected each distinction as "too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody." *Id.*

¶ 18 The *Mathis* Court reasoned that because a "routine tax investigation" may result in criminal charges, such probes are not immune from *Miranda*'s holding. *Id.* Additionally, "nothing in the *Miranda* opinion [exists] which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." *Id.* at 4–5, 88 S.Ct. 1503. Any such distinction, the Court opined, would "[go] against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights." *Id.* at 4, 88 S.Ct. 1503. For these reasons, the Court reversed the prisoner's tax fraud convictions, holding that the trial court had erred by permitting introduction of the prisoner's self-incriminating evidence. *Id.* at 5, 88 S.Ct. 1503.

¶ 19 Although *Mathis* seemingly established a bright line rule that the government must advise a person "in custody" of his *Miranda* rights before questioning him about matters that may lead to criminal proceedings, the Court later refused to read its prior decision so broadly. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ("We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent."). In *Perkins*, the Court reasoned that "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Id.* at 296, 110 S.Ct. 2394. The Court distinguished *Mathis* because the suspect in that case was aware that the inquiring agent was a government official who was investigating the possibility of noncompliance with the tax laws, thereby creating the type of intimidating surroundings addressed by *Miranda*. *Id.* at 299, 110 S.Ct. 2394. Notably, the Court recognized that the bare fact of custody may not always require *Miranda* warnings even when the suspect knows that he is speaking to a government official, but declined to explore that issue in the context of the case before it. *Id.;* see also *State v. Fulminante*, 161 Ariz. 237, 242–43, 778 P.2d 602, 607–08 (1988) (discussing *Mathis* and holding that a prison inmate is not "in custody" for purposes of *Miranda* unless his freedom of movement is further diminished at the time of questioning, thereby creating the coercive atmosphere that triggers *Miranda*'s protections).

■ ¶ 20 Following the holdings in *Mathis* and *Perkins*, the fact that Officer Siekmann questioned Schinzel about an offense unrelated to the one underlying his arrest did not relieve the police from their obligation to first advise Schinzel of his *Miranda* rights and obtain his waiver. Officer Siekmann questioned Schinzel while he was under arrest, handcuffed, and sitting in a chair surrounded by police officers. Clearly, Schinzel was "in custody" for purposes of *Miranda*. Like the inmate in *Mathis*, Schinzel was questioned about a crime different than the one underlying his custody. Like the Court in *Mathis*, we find this distinction "too minor and shadowy" to have removed this case from *Miranda*'s reach.

■ ¶ 21 The *Miranda* warnings are meant to preserve the privilege against self-incrimination during " 'incommunicado interrogation of individuals in a police-dominated atmosphere' " because such surroundings create " 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' " *Perkins*, 496 U.S. at 296, 110 S.Ct. 2394

(quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602); *see also Beckwith v. United States*, 425 U.S. 341, 346, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (noting that it is the custodial nature of the interrogation that triggers the need for compliance with *Miranda* ). Any risk that Schinzel would feel compelled to answer police questions due to his custodial surroundings would not have diminished simply because he was asked about an offense different than the one prompting his arrest.

¶ 22 We further decide that the trial court erred by hinging its suppression ruling on whether the police had probable cause to arrest Schinzel for possessing the pipes. The Court in *Mathis* rejected a similar contention, holding that a government agent's "routine" questions triggered *Miranda* because the probe may have resulted in criminal charges. *Mathis*, 391 U.S. at 4, 88 S.Ct. 1503. Rather than focusing on the inquiring agent's knowledge of the offense or his intentions, the Court viewed the custodial nature of the inquiry as determinative of the issue. *Beckwith*, 425 U.S. at 347, 96 S.Ct. 1612 ("[T]he [*Mathis* ] Court thus squarely grounded its holding on the custodial aspects of the situation, not the subject matter of the interview."). As reasoned by the Court in *Beckwith*, " '[i]t was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning.' " *Id.* at 346–47, 96 S.Ct. 1612 (citation omitted).

¶ 23 When Officer Siekmann posed his questions to Schinzel, the officer recognized the pipes as drug paraphernalia. Whether the officer had probable cause to arrest Schinzel for possessing the pipes is irrelevant to our analysis for the reasons explained in *Mathis* and *Beckwith*. *See also State v. Morse*, 127 Ariz. 25, 29, 617 P.2d 1141, 1145 (1980) (rejecting contention that existence of probable cause to arrest requires administration of *Miranda* warnings and deciding that custody is crucial issue in determining necessity of warnings). Likewise, whether Schinzel could have exonerated himself by implicating Montoya in his answers does not affect our decision. *Miranda*, 384 U.S. at 476–77, 86 S.Ct. 1602 (explaining that because the privilege against self-incrimination does not differentiate degrees of incrimination, no distinction may be drawn between inculpatory statements and statements alleged to be exculpatory). Instead, the fact that the officer's inquiry could have resulted in criminal charges, coupled with the fact of Schinzel's custody, means that the police were obligated to first advise Schinzel of his *Miranda* rights and secure a waiver before questioning him.

■ ¶ 24 In summary, we hold that a police officer must generally advise a person "in custody" of his *Miranda* rights and secure a waiver before questioning that person about events that may lead to criminal charges even if unrelated to the offense underlying custody. This procedure will not unduly hamper law enforcement because it is a simple matter to advise an in-custody suspect of his *Miranda* rights and receive a waiver before questioning him. Additionally, exceptions may occur, depending on the circumstances of each case. *See e.g., State v. Hein*, 138 Ariz. 360, 364–65, 674 P.2d 1358, 1362–63 (1983) (acknowledging "public safety" exception to *Miranda* ); *People v. Stevenson*, 51 Cal.App.4th 1234, 59 Cal.Rptr.2d 878, 881 (Cal.Ct.App.1996) (accepting "rescue doctrine" as exception to *Miranda* ); *People v. Soto*, 183 A.D.2d 926, 584 N.Y.S.2d 160, 161 (N.Y.App.Div.1992) (allowing minimal questioning of suspect at crime scene to discover what is transpiring).

■ ¶ 25 No exception to *Miranda* exists in this case, and the trial court erred by admitting Schinzel's incriminating answers to Officer Siekmann's questions about ownership of the dresser and pipes. Because admission of this evidence was the primary evidence demonstrating that Schinzel committed the offense, the error was not harmless. *State v. Garcia*, 200 Ariz. 471, 475, ¶ 23, 28 P.3d 327, 331 (App.2001). Consequently, we reverse Schinzel's conviction and sentence for possessing drug paraphernalia and remand for further proceedings.

## II. The marijuana, loose checks, wallet, and station house statements

¶ 26 Although the trial court ruled that Officer Siekmann's questions about ownership of the dresser and pipes were merely investigatory and did not trigger *Miranda*, it found that the officer's inquiry about "any other drugs inside of the apartment" was a "custodial interrogation," which required compliance with *Miranda*. Because the officer failed to advise Schinzel of his *Miranda* rights before asking this question, the court suppressed evidence of Schinzel's answer. Additionally, because no exception existed for the officer's warrantless search of the dresser drawer, and the officer discovered the methamphetamine only as a result of the illegal questioning of Schinzel, the court suppressed evidence of that drug. The court refused to suppress the marijuana, loose checks, and wallet discovered in the same drawer, however, because they were discovered "as a result of an unsolicited voluntary statement made by [Schinzel] that the police officer would find another small baggie of drugs in the top drawer." Finally, the court declined to suppress Schinzel's station house statements about the checks and identification cards found in his wallet because they were elicited after the police had advised him of his *Miranda* rights and he had waived them.

¶ 27 Schinzel argues that the trial court erred by refusing to suppress evidence of the marijuana, loose checks, wallet, and station house statements because (1) his statement about the location of the marijuana was responsive to the officer's illegal question and therefore constituted an additional *Miranda* violation, and (2) the evidence was the "poisonous fruit" of both the *Miranda* violations and the illegal search under the Fourth Amendment to the United States Constitution and Article 2, Section 8 of the Arizona Constitution. The State responds that the evidence was properly admitted because Schinzel's statement about the location of the marijuana was not prompted by the police, and his declaration therefore constituted an "independent source" for discovering the evidence that was untainted by the *Miranda* violation and the illegal search.[3]

¶ 28 The exclusionary rule required the trial court to suppress evidence of the marijuana, loose checks, wallet, and station house statements if the police obtained them directly or indirectly by violating the Fourth and Fifth Amendments and their state constitution counterparts. *Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *State v. Hackman*, 189 Ariz. 505, 508 & n. 3, 943 P.2d 865, 868 & n. 3 (App.1997). The test for exclusion is whether the evidence was obtained " 'by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (citation omitted). The exclusionary rule is inapplicable if the police obtained the evidence from an "independent source." *Hackman*, 189 Ariz. at 508, 943 P.2d at 868.

¶ 29 We agree with Schinzel that Officer Siekmann's discovery of the contested evidence and Schinzel's station house statements about part of that evidence were not sufficiently distinguishable from the *Miranda* violation and the illegal search to be purged of their taint. *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407. Schinzel's statement that the officer would also find a baggie of marijuana in the drawer was made after the officer had illegally asked the location of drugs, received permission to remove the drugs, searched the drawer, and then held up the bag of methamphetamine. Schinzel's assertion was directly responsive to the officer's inquiry without any intervening discussion. Additionally, the statement was made while Officer Siekmann was conducting the unlawful search. Under these circumstances, Schinzel's assertion stemmed from the officer's illegal inquiry and search and was not sufficiently distinguishable from those events to purge it of the primary taint.

---

**3.** The State does not argue that the search was valid as one incident to arrest. *See Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (holding that incident to arrest, police officer may search area within immediate control of arrestee to ensure absence of weapons and prevent destruction or concealment of evidence).

Accordingly, we reject the State's contention that Schinzel's statement was "voluntary" and therefore an independent source for discovery of the marijuana, loose checks, and wallet, and obtaining Schinzel's station house statements about the checks and identification cards.

¶ 30 Additionally, the officer's act in holding up the bag of methamphetamine for Schinzel's inspection, after having asked him about the location of drugs and while searching the drawer, constituted the "functional equivalent of questioning" that triggered *Miranda. Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). Officer Siekmann's act in holding up the bag was a "question" for purposes of *Miranda* if it was "reasonably likely to [have] elicit[ed] an incriminating response from [Schinzel]." *Id.* at 301, 100 S.Ct. 1682. We conclude that the officer's display of the bag was reasonably likely to have elicited a response from Schinzel that the officer had indeed found the drugs that Schinzel had just described. Thus, the officer's act was the functional equivalent of express questioning that triggered Schinzel's *Miranda* rights. For this additional reason, we hold that Schinzel's statement about the location of the marijuana was not voluntary and cannot, therefore, be considered an independent source for acquiring the contested evidence.

¶ 31 Because admission of this evidence was the primary evidence demonstrating that Schinzel possessed marijuana and committed forgery, the error was not harmless. *Garcia,* 200 Ariz. at 475, ¶ 23, 28 P.3d at 331. Consequently, we reverse Schinzel's convictions and sentences for these offenses and remand for further proceedings.

## CONCLUSION

¶ 32 We hold that the police conducted a custodial interrogation of Schinzel by asking him questions about an offense unrelated to the one underlying his arrest. Consequently, the trial court erred by refusing to suppress Schinzel's answers to these questions. Because the error was not harmless, we reverse Schinzel's conviction and sentence for possession of drug paraphernalia and remand for further proceedings.

¶ 33 We further decide that the police acquired evidence of marijuana, loose checks, the wallet, and Schinzel's station house statements about part of this evidence as a result of their violation of Schinzel's rights under the Fourth and Fifth Amendments to the United States Constitution and the corresponding provisions in the Arizona Constitution. Therefore, the trial court erred by refusing to suppress this evidence. Because this error was not harmless, we reverse Schinzel's convictions and sentences for possession of marijuana and forgery and remand for further proceedings.

CONCURRING: NOEL FIDEL, and JOHN C. GEMMILL, JJ.