IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

THE STATE OF ARIZONA,          )
                               )     2 CA-CR 2004-0306
                Appellee,      )     DEPARTMENT A
                               )
        v.                     )     O P I N I O N
                               )
ANTHONY SHARIFF GAY,           )
                               )
                Appellant.     )
                               )

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. CR-20011542

Honorable Cindy Jorgenson, Judge
Honorable Nanette M. Warner, Judge

AFFIRMED

Terry Goddard, Arizona Attorney General
  By Randall M. Howe and Nicholas D. Acedo                          Phoenix
                                                        Attorneys for Appellee

Robert J. Hooker, Pima County Public Defender
  By John F. Palumbo                                                Tucson
                                                       Attorneys for Appellant

H O W A R D, Presiding Judge.

**¶1** After a jury trial, appellant Anthony Gay was convicted of one count each of first-degree murder and first-degree burglary. The trial court sentenced him to natural life imprisonment for the murder conviction and a concurrent, presumptive term of 10.5 years in prison for the burglary conviction. On appeal, Gay argues the trial court erred by denying his motion to suppress evidence obtained during a search of his apartment, his *Batson*[1] challenge to the state's peremptory strikes of two prospective jurors, and his motion to suppress statements he made to police. He also argues the court erred by granting the state's motion to preclude expert testimony regarding the reliability of his statements to police at the hearing on his motion to suppress those statements. Finding no reversible error, we affirm.

## Background

**¶2** We view the evidence in the light most favorable to sustaining the convictions. *See State v. Newnom*, 208 Ariz. 507, ¶ 2, 95 P.3d 950, 950 (App. 2004). On April 10, 2001, a Tucson police officer responding to a "check welfare" call discovered Stacy McKeown stabbed to death in her apartment. Police began looking for Gay, a former neighbor of McKeown's, after learning that his fingerprints matched those on a telephone in McKeown's apartment. Police arrested Gay at the apartment he shared with his girlfriend, Veronica Fresby. Police later searched the apartment pursuant to a search warrant, finding

---

[1]*Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

a ring and a shirt that belonged to McKeown, as well as a pair of jeans with both Gay's and McKeown's blood on them.

¶3        Other evidence incriminated Gay: his blood was found in various places in McKeown's apartment; his semen was found on her vagina; his semen and blood were found on her nightgown; his fingerprints were found on a beer can in her kitchen; and he pawned several compact discs and videocassettes, at least one of which had both his and McKeown's fingerprints on it. Following his arrest, Gay admitted being in McKeown's apartment in the early morning of April 10, but insisted he did not kill McKeown. Toward the end of his interrogation by police, however, Gay stated he "just went crazy."

## Search of Gay's Apartment

¶4        Gay first argues the trial court erred by denying his motion to suppress evidence obtained during a search of his apartment. When reviewing a trial court's denial of a motion to suppress, we review only the evidence presented at the hearing on the motion to suppress, *State v. Spears*, 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996), and we view it in the light most favorable to sustaining the trial court's ruling, *State v. Rosengren*, 199 Ariz. 112, ¶ 2, 14 P.3d 303, 306 (App. 2000). We review the court's decision "for abuse of discretion if it involves a discretionary issue, but review constitutional issues and purely legal issues de novo." *State v. Booker*, 212 Ariz. 502, ¶ 10, 135 P.3d 57, 59 (App. 2006).

¶5        Several days after the murder, police obtained a warrant for Gay's arrest after learning that fingerprints taken from a telephone in McKeown's apartment matched Gay's.

3

Police went to Fresby's apartment in order to inform her of the arrest warrant for Gay and in an attempt to obtain consent to search the apartment, which she shared with Gay. They did not think Gay would be there. Detectives Thompson and Olivas entered the apartment with Fresby's permission, and Fresby agreed to give a tape-recorded statement. She refused to consent to a search of the apartment, so other officers left to obtain a search warrant. Olivas remained in the apartment to finish taking Fresby's statement.

¶6        At some point, Fresby stopped talking and asked Olivas to leave. He refused to leave because he was concerned Fresby might destroy evidence. He permitted Fresby to go back to her bedroom after she asked to call her lawyer and to change clothes, but he asked her to keep the door slightly open. Fresby came out of the room and eventually told Olivas that Gay was in the apartment and would surrender. Gay came out and was arrested without incident. Meanwhile, the detectives who had left to obtain a search warrant returned in response to the arresting officer's page notifying them of Gay's arrest. Following the arrest, police obtained a warrant to search the apartment. A search of the apartment revealed the incriminating evidence.

¶7        Gay moved to suppress the evidence obtained during the search. The trial court denied the motion, determining that the search was reasonable under *Illinois v. McArthur*, 531 U.S. 326, 121 S. Ct. 946 (2001). Gay argues that once Fresby asked the officer to leave and he refused, a seizure in violation of the Fourth Amendment began.

4

¶8　　　　　The United States and Arizona Constitutions protect persons from unreasonable searches and seizures. *See* U.S. Const. amends. IV, XIV; Ariz. Const. art. II, § 8. Police generally may not search a home or seize evidence without a warrant supported by probable cause. *McArthur*, 531 U.S. at 330, 121 S. Ct. at 949; *State v. Smith*, 208 Ariz. 20, ¶ 6, 90 P.3d 221, 223 (App. 2004); *Mehrens v. State*, 138 Ariz. 458, 460, 675 P.2d 718, 720 (App. 1983). Evidence seized as a result of a violation of the Fourth Amendment generally must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963); *State v. Soto*, 195 Ariz. 429, ¶ 9, 990 P.2d 23, 25 (App. 1999). But there are exceptions to the warrant requirement, including the exigent circumstances exception. *McArthur*, 531 U.S. at 331, 121 S. Ct. at 950; *Mazen v. Seidel*, 189 Ariz. 195, 197, 940 P.2d 923, 925 (1997).

¶9　　　　　In *McArthur*, police refused to allow McArthur to reenter his home without a police escort for about two hours, while they obtained a warrant to search the home for drugs. 531 U.S. at 328-29, 121 S. Ct. at 948-49. When McArthur did enter, a police officer stood just inside the door and watched what McArthur did. *Id.* at 329, 121 S. Ct. at 949. An Illinois appellate court upheld the trial court's decision to suppress the drug evidence obtained after a search pursuant to the warrant. *Id.* at 329-30, 121 S. Ct. at 949. The Supreme Court reversed. *Id.* at 337, 121 S. Ct. at 953. In upholding the search, it relied on the exigent circumstances exception to the warrant requirement. *Id.* at 331, 333, 121 S. Ct.

5

at 950, 951. The Court considered four circumstances "in combination." *Id.* First, the police had probable cause to believe the residence contained contraband. *Id.*

> Second, the police had good reason to fear that, unless restrained, McArthur would destroy the drugs before they could return with a warrant. . . .
>
> Third, the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy. They neither searched the trailer nor arrested McArthur before obtaining a warrant. Rather, they imposed a significantly less restrictive restraint, preventing McArthur only from entering the trailer unaccompanied. They left his home and his belongings intact–until a neutral Magistrate, finding probable cause, issued a warrant. . . .
>
> Fourth, the police imposed the restraint for a limited period of time, namely, two hours.

*Id.* at 332, 121 S. Ct. at 950-51.

¶10        Gay's challenge centers on the second and third circumstances announced in *McArthur*.[2] We conclude those requirements were met here. Because Gay and Fresby shared the apartment, it was reasonable for the detectives to believe there might be evidence incriminating Gay in the apartment, and Fresby might have incentive to destroy it. *See McArthur*, 531 U.S. at 331, 121 S. Ct. at 950 (police claim of "specially pressing or urgent law enforcement need" must be "plausible"). Furthermore, the police made a reasonable attempt to accommodate Gay's privacy by not searching the apartment until they had

_____

[2]Gay concedes that police had probable cause to search the apartment and does not argue that the restraint was excessive in duration.

obtained a warrant. *See id.* at 332, 121 S. Ct. at 950 (decision not to search prior to obtaining warrant a factor in reasonableness of temporary seizure). And Gay cannot raise any violation of Fresby's privacy interests here. *See State v. Papineau*, 146 Ariz. 272, 273, 705 P.2d 949, 950 (App. 1985) ("Only one whose own rights have been violated may seek the remedy of exclusion.").

¶11        But Gay argues, citing *State v. Ault*, 150 Ariz. 459, 724 P.2d 545 (1986), that any exigent circumstance stemming from concern that Fresby might destroy evidence was created by police because they failed to obtain a search warrant prior to going to the apartment. In *Ault*, the police went to the defendant's house with the ultimate intention of arresting him. *Id.* at 464, 724 P.2d at 550. Our supreme court held that police could not enter the residence to secure it out of concern that the defendant might destroy evidence because, by not obtaining an arrest warrant and arresting the defendant at the front door of his home when they had the opportunity and probable cause to do so, the police created the exigency. *Id.* at 463-64, 724 P.2d at 549-50. The court concluded the evidence the police had seized without a warrant while accompanying Ault inside the house should have been suppressed. *Id.* at 462, 466, 724 P.2d at 548, 552.

¶12        Here, the police did not believe Gay would be at the apartment and did not go there to arrest Fresby or Gay. Instead, they intended to inform Fresby of the arrest warrant for Gay and gain her consent to search the apartment. Consent is a valid exception to the warrant requirement. *State v. Jones*, 185 Ariz. 471, 480, 917 P.2d 200, 209 (1996).

The police did not act unreasonably in attempting to acquire her consent. Additionally, when Fresby did not consent to a search, officers left to get a warrant rather than attempt to "circumvent the warrant requirement." *Ault*, 150 Ariz. at 463, 724 P.2d at 549. And, in contrast to the police in *Ault*, they did not seize any evidence pending the arrival of the warrant. Thus, an exigency existed, and police did not create it.

¶13 Gay next argues that, unlike in *McArthur*, Olivas was inside the residence, and this made the seizure unreasonable. Gay emphasizes the following language from *McArthur*: "Temporarily keeping a person from entering his home, a consequence whenever police stop a person on the street, is considerably less intrusive than police entry into the home itself in order to make a warrantless arrest or conduct a search." 531 U.S. at 336, 121 S. Ct. at 953. But, in *McArthur*, the Supreme Court noted that the officers entered the apartment with the defendant, *id.* at 329, 121 S. Ct. at 949, which is basically what occurred here. And Fresby had allowed the officers to enter originally and she, not Gay, was the person interacting with the officers. Additionally, Olivas did not remain in the apartment "to make a warrantless arrest or conduct a search," *id.* at 336, 121 S. Ct. at 953, but rather, to prevent Fresby from destroying evidence while officers obtained a warrant. And the Court in *McArthur* did not state that its ruling turned on the fact that the officer remained outside, instead noting more generally that "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *Id.* at 332, 121 S. Ct. at 950. The police did that here. Olivas did not follow Fresby to the bedroom when she requested to call her attorney

8

and change clothes. Neither did he attempt to search the apartment; as in *McArthur*, Gay's home and belongings were left intact. *See id.* at 332, 121 S. Ct. at 950.

¶14 Gay cites no case holding that *McArthur* turns on the fact that the officer remained outside unless accompanying the defendant inside. Indeed, cases from other jurisdictions interpreting *McArthur* do not support Gay's position. *See, e.g., In re Elizabeth G.*, 105 Cal. Rptr. 2d 811, 813, 816 (Ct. App. 2001) (search reasonable where "police ordered [residents] into the living room and explained that they would have to be escorted through the residence"); *Byrd v. State*, 780 A.2d 1224, 1226, 1228 (Md. Ct. Spec. App. 2001) (search reasonable where police "impounded the home for three hours, while awaiting issuance of [a search] warrant"); *People v. Ellison*, 773 N.Y.S.2d 860, 862, 866 (Sup. Ct. 2004) (search reasonable where police "'breach[ed] and h[e]ld' the subject apartment while . . . obtain[ing] a search warrant").

¶15 In order to comply with Gay's interpretation of *McArthur*, Olivas would have had to exit the apartment upon Fresby's request, but then Olivas, in turn, could have demanded that Fresby also exit the apartment. From that point until police obtained a warrant, Olivas could have prevented Fresby from returning to the apartment without him escorting her. We do not believe it was any less reasonable for Olivas simply to remain

9

inside the apartment and allow Fresby to return to the bedroom while he observed her from his vantage point.[3]

### *Batson* **Challenge**

**¶16**       Gay next argues the trial court erred by "denying [his] *Batson* challenges to the state's peremptory strikes of two African-American jurors." When reviewing a trial court's ruling on a *Batson* challenge, we defer to its factual findings unless clearly erroneous, but review its legal determinations de novo. *State v. Lucas*, 199 Ariz. 366, ¶ 6, 18 P.3d 160, 162 (App. 2001).

**¶17**       The Equal Protection Clause of the Fourteenth Amendment prevents peremptory strikes of prospective jurors solely based upon race. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986). A *Batson* challenge involves three steps. First, the party challenging the strike must make a prima facie showing that the strike was based on race. *Lucas*, 199 Ariz. 366, ¶ 7, 18 P.3d at 162. Second, the party making the strike may then offer a race-neutral explanation. *Id.* That explanation "must be more than a mere denial of improper motive, but it need not be 'persuasive, or even plausible.'" *Id., quoting Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995). Third, the party challenging the strike must persuade the trial court that the proffered race-neutral

---

[3]Gay appears to argue that Fresby did not voluntarily consent to a search of the apartment. But Fresby's consent is irrelevant because the search was conducted pursuant to a warrant, not consent. And, because we conclude that the police did not conduct an illegal search or seizure, we necessarily reject Gay's further claim that the search warrant was tainted by this alleged violation.

explanation is pretextual. *Id.* During the third step, the trial court evaluates the credibility of the state's proffered explanation, considering factors such as "the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322, 339, 123 S. Ct. 1029, 1040 (2003). Because the "trial court is in a better position to assess" credibility than we are, its "finding at this step is due much deference." *State v. Newell*, 212 Ariz. 389, ¶ 54, 132 P.3d 833, 845 (2006).

¶18            During jury selection, Gay challenged the state's peremptory strikes of African-American venirepersons Barnard and Parker. The prosecutor offered the following reasons for striking Barnard: (1) she was "not at all happy" with how police handled the investigation of her nephew's murder; (2) she seemed "stern looking" and "angry," with "kind of a glare"; and (3) she did not make eye contact with the prosecutor. The prosecutor offered the following reasons for striking Parker: (1) she disliked the death penalty; (2) she "had problems with graphic details and gruesome photos"; (3) she was "sympathetic according to [the state's] drug user question"; and (4) she would be distracted by upcoming medical tests. The trial court ruled that the state's explanations were race-neutral and not pretextual[4] and denied Gay's *Batson* challenges.

---

[4]In doing so, the trial court implicitly found that Gay had made a prima facie case under step one of *Batson*. *Cf. State v. Hernandez*, 170 Ariz. 301, 304, 823 P.2d 1309, 1312 (App. 1991) (assuming trial court found defendant had made a prima facie case where trial court asked state to explain its strikes). The state does not appear to challenge this implicit finding, although four African-Americans served as either jurors or alternates. And,

11

¶19 The trial court did not err by finding the state's explanations facially race-neutral. *See State v. Roque*, 213 Ariz. 193, ¶ 15, 141 P.3d 368, 379 (2006) ("Antipathy toward the police alone may constitute a valid reason to strike jurors when the State's case relies on police testimony."); *Newell*, 212 Ariz. 389, ¶ 58, 132 P.3d at 845-46 (decision to strike juror for "contradictory responses about whether [the juror] could vote to impose the death penalty . . . was facially race-neutral"); *State v. Hernandez*, 170 Ariz. 301, 305, 823 P.2d 1309, 1313 (App. 1991) ("It is permissible to rely on a prospective juror's mode of answering questions as a basis for peremptory selections."). And determining the validity of those explanations required the court to evaluate the sincerity of the prosecutor as well as the behavior of the jurors. These are credibility determinations that the court was in the best position to make. *See Newell*, 212 Ariz. 389, ¶ 54, 132 P.3d at 845; *cf. State v. Hansen*, 156 Ariz. 291, 297, 751 P.2d 951, 957 (1988) ("[T]he trial court is in a better position to judge whether [a] prosecutor is unduly sarcastic, his tone of voice, facial expressions, and their effect on the jury, if any."). We defer to those determinations here.

¶20 Gay cites the statistical disparity between the percentage of African-American panelists struck (thirty-three percent) and the percentage of African-Americans in the venire after the parties exercised their peremptory strikes (seventeen percent), in support of his

---

because the prosecutor offered an explanation for her strikes, this preliminary issue became moot in any event. *See Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 1866 (1991) (plurality opinion); *State v. Rodarte*, 173 Ariz. 331, 333, 842 P.2d 1344, 1346 (App. 1992).

argument that these two strikes "were not racially neutral, and were purposefully discriminatory in violation of *Batson*." A statistical disparity can constitute evidence of purposeful discrimination. *See Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 240-41, 125 S. Ct. 2317, 2325 (2005). But the fact that four African-Americans served as either jurors or alternates is "'indicative of a nondiscriminatory motive.'" *State v. Cañez*, 202 Ariz. 133, ¶ 23, 42 P.3d 564, 577 (2002), *quoting State v. Eagle*, 196 Ariz. 27, 30, 992 P.2d 1122, 1125 (App. 1998). Thus, the statistical disparity alone does not suggest the trial court erred.

¶21 Gay further argues the prosecutor questioned African-American jurors more aggressively on their attitudes toward the death penalty and law enforcement than other jurors and that non-African-American jurors with similar answers were not struck. In *Miller-El II*, the Court found evidence of intentional discrimination in "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." 545 U.S. at 241, 125 S. Ct. at 2325. The Court noted that, "[i]f a prosecutor's reason for striking a black panelist applies just as well to an otherwise-similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.*

¶22 Barnard, an African-American female, responded to a group voir dire question by the trial court that she "had a nephew killed in . . . [a] drive-by shooting . . . [and

13

n]obody was ever held accountable for that."[5] The trial court then further explored her attitudes toward law enforcement, and Barnard expressed that her family was not satisfied with how police handled the situation but that she would be able to separate that experience from jury service in Gay's case. During individual voir dire, the prosecutor further questioned Barnard about her attitude toward law enforcement, and she responded that it would not affect her ability to serve as a juror in Gay's case.

¶23     Gay compares this questioning with voir dire of three other jurors, all non-African-Americans who served on the jury. During group voir dire, juror David responded that three of his family members were assaulted by the husband of one of the family members. Juror Painter responded that she had been the victim of a crime for which the assailant was never prosecuted. And juror Kinsella responded that a close friend of hers had been charged with murder and, as she said, found "guilty of murder by insanity." None of these jurors expressed a negative attitude toward law enforcement during group voir dire, and the prosecutor did not question any of them about attitudes toward law enforcement during individual voir dire.

¶24     We disagree with Gay that the prosecutor's disparate questioning suggests discriminatory purpose. Barnard was the only panelist among those discussed who

[5]The transcript of group voir dire reflects that this response came from venireperson number 41, and Barnard was venireperson number 49. But the transcript of individual voir dire with Barnard suggests—and the parties appear to agree—that the response was Barnard's.

suggested during group voir dire that she had a negative attitude toward law enforcement. In fact, David and Kinsella stated that the perpetrators of the crimes they discussed had been arrested and convicted. And although Painter responded that her assailant had never been prosecuted, she said nothing during group voir dire that suggested she had a negative attitude toward law enforcement. Thus, the prosecutor may not have felt she needed to explore the attitudes of these three toward law enforcement.

¶25 Parker, an African-American female whom the state struck, explained during group voir dire that her cousin's husband murdered her cousin, and the husband was executed for the crime. Although she said that crime would not affect her jury service and that she "felt [death] . . . was an appropriate sentence" in that case, she had answered in a questionnaire that "as a nurse, mother and Christian [the death penalty] would be a difficult decision for [her]." The trial court later probed her reservations about the death penalty, and she answered that she could "[f]ollow the law."

¶26 Gay compares these responses[6] of Parker with those of jurors Bernard and Kinsella, both non-African-Americans who served on the jury. Bernard responded in a questionnaire that she "could vote to impose the death penalty if [she] believed it was warranted in a particular first degree murder case, depending on the evidence along with what [she] learned about the defendant." During voir dire, she stated she "fe[lt] that [her]

_____

[6]Gay also cites Parker's responses to other questions involving other topics, but he does not cite comparable responses of Bernard and Kinsella.

15

answer [wa]s the same," but also stated she "would be more against the death penalty just because [she] d[id]n't feel that any person should lose their life in the hands [sic] of another human." She ultimately said she could follow the law. Kinsella said she had not thought about having to make the decision to impose the death penalty, and from her experience working in an emergency room, she "never kn[e]w how something [wa]s going to affect [her] until [she was] introduced to it." She also stated she could follow the law.

¶27        Although there is some similarity among the answers of Parker, Bernard, and Kinsella, we note that it was only Parker who was personally affected by a death sentence. Additionally, the trial court was in a better position than we are to evaluate both the sincerity of the jurors' responses and the prosecutor's explanations. *See Newell*, 212 Ariz. 389, ¶ 54, 132 P.3d at 845. We defer to those determinations.

¶28        Even were we to agree with Gay that these comparisons provided some evidence of discriminatory purpose, that evidence alone would be insufficient to sustain Gay's *Batson* challenge. In *Miller-El II*, the Supreme Court relied not only on "remarkable" statistical disparities and "side-by-side comparisons" of jurors, 545 U.S. at 240-41, 125 S. Ct. at 2325, but also emphasized "broader patterns of practice," including "shuffling the venire panel" and "widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time Miller-El's jury was selected." *Id.* at 253, 125 S. Ct. at 2332. The Court recognized that "at some points the significance of Miller-El's evidence [wa]s open to judgment calls, but

16

when this evidence on the issues raised [wa]s viewed cumulatively its direction [wa]s too powerful to conclude anything but discrimination." *Id.* at 265, 125 S. Ct. at 2339.

¶29        Finally, Gay suggests the prosecutor's justifications for striking Barnard and Parker were simply implausible. But, as discussed above, the trial court was in a better position than we are to evaluate the veracity of the prosecutor's claims and the sincerity of the jurors' answers. *See Newell*, 212 Ariz. 389, ¶ 54, 132 P.3d at 845. The record supports the court's determinations, and we defer to them. Accordingly, the court did not err by denying Gay's *Batson* challenge.

### *Miranda* **Waiver**

¶30        Gay next argues the trial court erred by denying his motion to suppress statements he made to police because he did not knowingly, intelligently, and voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). We review the court's decision for an abuse of discretion. *See State v. Schinzel*, 202 Ariz. 375, ¶ 12, 45 P.3d 1224, 1227 (App. 2002). We consider only the evidence presented at the suppression hearing, and we view that evidence in the light most favorable to sustaining the trial court's ruling. *Id.* But we review the court's legal conclusions de novo. *Id.*

¶31        After arresting Gay, Detectives Olivas and Thompson took a statement from him. After Olivas informed Gay of his *Miranda* rights, Gay asked: "Well, when is it possible to have an, an attorney appointed to me?" The following exchange then occurred:

> [Olivas]:        If, if you want an attorney, at this point, I'm not
>                  gonna ask you any questions at all.  What's

17

gonna happen is you're gonna go to the jail, tomorrow you're gonna have arraignment, and then an attorney will be appointed for you. If you can't afford, if you cannot afford one.

[Gay]: But would I get an attorney anyway? I mean . . . ?

[Olivas]:     Yes.

[Gay]: Oh, okay.

[Olivas]:     Do you understand that?

[Gay]: Yeah, I, I guess.

[Olivas]:     Well, there can't be no [sic] guessing. I need to, either you don't understand them, or you do. If you wanna talk to us, everything you say can be used against you in a court of law. If you don't wanna talk to us, you don't have to talk to us, basically is [sic] what's gonna go, happen is, I'm gonna, I will ask you information on a booking form, nothing about the case and then you're going to jail. At the jail, within the next few days or, or a week or so, you, you'll, they'll appoint you a lawyer if you cannot afford one.

[Thompson]: Actually they'll appoint him the, the attorney at his initial appearance, which will be tomorrow at two.

[Olivas]:     They'll tell you who your attorney is.

[Thompson]: Right.

[Olivas]:     You may not have a chance to talk to him, but you'll have an attorney.

[Gay]: Okay. That's even, when, if we do talk?

18

[Olivas]:      Right.

[Gay]: Okay.

[Olivas]:      Okay?

[Gay]: Yeah.

[Olivas]:      You understand that?

[Gay]: Mmm hmm [positive response].

[Olivas]:      Are you willing to talk with me?

[Gay]: Yeah.

¶32      Gay first argues his question about when a lawyer would be appointed for him was an unambiguous request for counsel, and the police violated his *Miranda* right to counsel by continuing questioning him.  When an accused invokes the *Miranda* right to counsel, police must cease questioning and may not further question the accused "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1885 (1981).  For an invocation of the *Miranda* right to counsel to be effective, the accused "'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'"  *State v. Eastlack*, 180 Ariz. 243, 250, 883 P.2d 999, 1006 (1994), *quoting Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994).

19

¶33 A "reasonable police officer in the circumstances" would not have understood Gay's question as a request for an attorney, especially because Olivas prefaced his reading of Gay's *Miranda* rights by saying: "If you have any questions at all, I want you to ask them and if you don't understand [the *Miranda* rights], I want you to tell me. Okay?" Because Gay's question was not an unambiguous invocation of his *Miranda* right to counsel, police did not violate that right by continuing questioning him to clarify whether he wished to invoke his rights.

¶34 Gay cites *People v. Harris*, 552 P.2d 10 (Colo. 1976), and *State v. Inman*, 151 Ariz. 413, 728 P.2d 283 (App. 1986), in support of his argument that his question was an unambiguous invocation of his *Miranda* right to counsel. In *Harris*, the Colorado Supreme Court held that the question, "When can I get a lawyer?" was an invocation of the accused's *Miranda* right to counsel. 552 P.2d at 235-37. In *Inman*, Division One of this court cited *Harris* in holding that a similar question was, "[a]t [the] very least[,] . . . an ambiguous request for counsel that, without more, should have stopped all questioning except that which would have been necessary to clarify whether [the accused] wanted a lawyer before questioning." *Inman*, 151 Ariz. at 416, 728 P.2d at 286.

¶35 *Inman*, however, did not conclude that a question like Gay's was an unambiguous invocation of *Miranda* rights. *See id.* Moreover, both *Inman* and *Harris* preceded *Davis*, in which the Supreme Court clarified that an invocation of *Miranda* rights must be "sufficiently clear[] that a reasonable police officer in the circumstances would

20

understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355.

¶36        Gay next contends that, even if his question was ambiguous, the police still violated *Miranda* by failing to clarify sufficiently whether he was in fact requesting counsel, and thus, he failed to understand the scope of his *Miranda* rights. In Arizona, when a request for counsel is ambiguous, police must limit any further questioning to clarify defendant's request. *See State v. Finehout*, 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983); *see also Inman*, 151 Ariz. at 416, 728 P.2d at 286. Here, following Gay's ambiguous assertion, Olivas limited his questioning to explaining what would happen to Gay if he requested an attorney and when he would be able to access that attorney. Although Olivas and Thompson had some difficulty explaining exactly when Gay's attorney would be appointed, they did make clear that if he asked for an attorney, they would cease questioning and an attorney would be appointed for him. Because Olivas and Thompson limited this further questioning to clarifying Gay's statement, there was no *Miranda* violation.

## Voluntariness and Reliability of Confession

¶37        Finally, Gay argues the trial court erred by precluding Dr. Jacquelyn St. Germaine from offering expert testimony regarding the effects of crack cocaine on the human body at a hearing on Gay's motion to suppress statements he made to police. We review a trial court's decision to preclude expert testimony for an abuse of discretion. *State v. Speers*, 209 Ariz. 125, ¶ 13, 98 P.3d 560, 564 (App. 2004).

21

¶38     In his motion to suppress, Gay argued his statements were involuntary. At the evidentiary hearing on the motion, Gay sought to introduce expert psychological testimony from St. Germaine on the effects crack cocaine, or withdrawal from crack cocaine, may have had on Gay's state of mind during the police interview. The state moved to preclude St. Germaine from testifying at the hearing, arguing that expert testimony regarding Gay's state of mind would be irrelevant to a voluntariness determination in the absence of any evidence of police coercion.

¶39     The trial court agreed with the state, finding "no evidence of police coercion during the taping of the defendant's statements" and determining that St. Germaine's testimony would not aid the court in determining voluntariness. *See* Ariz. R. Evid. 702, 17A A.R.S. (expert testimony admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"). It also ruled that testimony by St. Germaine about Gay's mental state at the time of questioning was precluded by *State v. Hyde*, 186 Ariz. 252, 276, 921 P.2d 655, 679 (1996), in which our supreme court held that expert psychological testimony is "not appropriate . . . to show the actual mental state of a defendant at a given time."

¶40     Although the Due Process Clause of the Fourteenth Amendment prohibits the admission of involuntary confessions, police coercion "is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 522 (1986). Thus, a defendant's state of mind cannot prove a confession involuntary

22

"by itself and apart from its relation to official coercion." *Id.* at 164, 107 S. Ct. at 520; *see State v. Stanley*, 167 Ariz. 519, 524, 809 P.2d 944, 949 (1991) ("critical element" in voluntariness analysis is "whether police conduct constituted overreaching"). The trial court found that there was no evidence of police coercion in this case, and the record supports that finding. Without evidence of police coercion, St. Germaine's testimony could not have aided the court in determining voluntariness. Accordingly, the court did not abuse its discretion in precluding her testimony.

¶41 Gay further argues St. Germaine's testimony could have been relevant to a determination that his statement was unreliable, as he argued in his motion for reconsideration below.[7] Relying on *Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142 (1986), he contends that "the legal issue of whether a confession is *voluntary* is separate from the factual issue of whether a confession is *reliable*." But the issue in *Crane* was the admissibility *at trial* of testimony regarding the reliability of a confession. *Id.* at 684, 106 S. Ct. at 2143. The Court noted that "'questions of credibility, whether of a witness or of a confession, are for the jury.'" *Id.* at 688, 106 S. Ct. at 2145, *quoting Jackson v. Denno*, 378 U.S. 368, 386 n.13, 84 S. Ct. 1774, 1786 n.13 (1964). On the other hand, "the purpose that a voluntariness hearing is designed to serve has nothing whatever to do with improving

_____

[7]Following the assignment of his case to a different judge, Gay moved for reconsideration of Judge Jorgenson's ruling on St. Germaine's testimony. Judge Warner denied that motion, explicitly approving Judge Jorgenson's reliance on *Hyde* and *Connelly*, but not discussing the Rule 702 analysis.

the reliability of jury verdicts." *Lego v. Twomey*, 404 U.S. 477, 486, 92 S. Ct. 619, 625 (1972).

¶42 The state only challenged Gay's attempt to introduce St. Germaine's testimony at the voluntariness hearing; it expressly stated it would not object to the use of her testimony at trial. But Gay did not attempt to introduce her testimony at trial and does not allege any trial error regarding the reliability of his statements to police. Accordingly, Gay's reliance on *Crane* is misplaced.

¶43 Gay also challenges the trial court's reliance on *Hyde*, arguing that St. Germaine would not have testified regarding Gay's mental state during questioning, but rather, would have testified regarding "the general effects of crack cocaine and withdrawal from crack and that [Gay's] statements were consistent with those of a person who is addicted to crack and 'crashing.'" But to the extent that he argued she would testify about the general effects of crack cocaine or withdrawal from crack cocaine on the human body, that testimony would have been irrelevant to the voluntariness analysis. Furthermore, her report was insufficient to establish that his statements were "so unreliable that they [should have] be[en] excluded under the evidentiary laws of the forum." *State v. Tucker*, 157 Ariz. 433, 445-46, 759 P.2d 579, 591-92 (1988). Accordingly, we find no error in the court's decision to preclude St. Germaine's testimony.

## Conclusion

¶44 For the foregoing reasons, Gay's convictions and sentences are affirmed.

24

_____
JOSEPH W. HOWARD, Presiding Judge


CONCURRING:


_____
JOHN PELANDER, Chief Judge


_____
GARYE L. VÁSQUEZ, Judge